**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOAN IVAN and ANGEL JAZIKOFF, | : |
| Plaintiffs, | : **OPINION** |
| v. | : Civil Action No. 03-1703 (WHW) |
| COUNTY OF MIDDLESEX; MIDDLESEX COUNTY SHERIFF'S DEPARTMENT; SHERIFF JOSEPH C. SPICUZZO, individually and in his official capacity as Sheriff of the Middlesex County Sheriff's Department; UNDERSHERIFF ANGELO FALCONE, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; LIEUTENANT DONALD BLOUNT, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; SERGEANT BRUCE ALLEN, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; OFFICER ROBERT LANDIS, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; OFFICER ALEXANDER PEPENELLA, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department and JOHN DOES 1-10 (fictitious names) individually and in their official capacities as Sheriff's Officers of the Middlesex County Sheriff's Department | : |
| Defendants. | |

FOR PUBLICATION

**Walls, Senior District Judge**

Both plaintiffs and defendants move for summary judgment.  Defendants' motions are granted in part and denied in part.  Plaintiffs' motion is denied.

**FACTS AND PROCEDURAL BACKGROUND**

This matter arises from allegations of sexual harassment and gender discrimination in the Middlesex County Sheriff's Department (the "Department"), where plaintiffs Joan Ivan and Angel Jazikoff served as sheriff's officers.  Plaintiffs charge they were subjected to specific instances of sexual harassment, Ivan by Sergeant Bruce Allen and Jazikoff by sheriff's officer Robert Landis, sheriff's officer Alexander Pepenella and Lieutenant Donald Blount.  Both plaintiffs also claim that written policies and customs of the Department constitute unlawful gender discrimination under state and federal law.  The relevant facts are as follows.[1]

**Ivan**

---

[1]Counsel for both parties have expended significant energy on the question of what is properly included in plaintiffs' Statement of Facts, filed with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.  See Letter from Jeffrey S. Garrigan, dated as of May 23, 2008 (Dkt. No. 158, filed May 29, 2008); see also Letter from Craig L. Corson, dated as of May 29, 2008 (Dkt. No. 159, filed May 29, 2008).  The Court knows all too well that a statement of facts, pursuant to Local Rule 56.1, that contains a combination of fact, opinion and legal conclusions presents a significant burden on the Court to determine what facts are disputed by the parties.  C.f. New Jersey Auto Ins. Plan v. Sciarra, 103 F.Supp.2d 388, 395 n. 4 (D.N.J. 1998).  The Court appreciates that defense counsel took the time to clarify plaintiffs' Statement of Facts, which the court agrees in certain instances overstepped the bounds of Local Rule 56.1 by mixing legal analysis and opinion with fact.  However, the Court is able to separate fact from opinion and, in considering the present motions, has done just that.  The Court also, as it must, accepts the allegations of the non-moving party as fact and reasonable inferences therefrom in defiance of the motion.

FOR PUBLICATION

Ivan was hired in January of 1999 and served as a sheriff's officer until her termination on October 14, 2003.  Allen was a sergeant in the Department and, for a time, Ivan's direct supervisor.  Allen's harassment often took the form of verbal abuse.  Between August and November of 1999 Allen on several occasions, upon observing Ivan smoking on her break, commented as to how "disgusting" Ivan looked, (Certification of John P. Nulty, Jr. (Dkt. No. 150 (filed Apr. 15, 2008)) ("Nulty Cert."), Ex. C, Ivan Dep. 89:6 to 89:13., Dec. 8, 2004.), and requested that she wear her hair up.  (Certification of Patrick J. Bradshaw ("Bradshaw Cert."), Ex. I, Ivan Dep. 83:18-84:5.)  Although County procedures did require hair to be "neat and clean," (Bradshaw Cert., Ex. I, Ivan Dep. 84:16-21.), Allen added that it was "no wonder [Ivan did not] have a date."  (Nulty Cert., Ex. C, Ivan Dep. 92:11 to 92:24.)  Ivan never reported these incidents.  Another sheriff's officer testified that Allen, in the presence of Ivan, said that Ivan needed a "good stiff fucking," was "sucking her way to the top" and commented that females were useless and had no place in the department.  (Nulty Cert., Ex. E, Netta Dep. 44:45-46:15; 48:18-19.)

On November 3, 1999, Ivan expressed interest in attending a military birthday party for veterans who served in the Department.  Allen grumbled, "[I] forgot they allow bimbos in the Navy now."  Notwithstanding this missive, Ivan insisted that she planned to attend.  In response, Allen asserted, "Mark my words.  No, you will not."  (Nulty Cert., Ex. C, Ivan Dep. 113:21 to 121:14.)  Ivan reported this incident to Sgt. Orpen and Lt. Sathan but was advised to simply try to ignore it.  (Nulty Cert., Ex. G at ¶¶ 3-4.)   On the morning of the party, Ivan was transferred to

FOR PUBLICATION

Transportation Division and Allen chided, "... told you you're not going to be here." (Nulty Cert., Ex. C, Ivan Dep. 116:9-117:8.)

After such transfer Ivan had only limited contact with Allen.  (Bradshaw Cert., Ex. I, Ivan Dep. 125:10-20; 127:19-23; 125-1:12.).  Ivan testified that she could not recall any harassment occurring between November, 1999 until August, 2000,  (Id., Ivan Dep. 244:21-245:23.), when, after a party to celebrate the retirement of another officer, (hereinafter, the "Galway Retirement Party"), Allen touched Ivan's buttocks and said "Come on baby.  You're a tease.  Come on.  You know you want this.  You know you want me."  (Nulty Cert., Ex. C, Ivan Dep. 270:19-271:22.) When Ivan failed to respond to these overtures, Allen added "You really are a bitch!" "You aren't a cop, you are a tease!" "Your looks aren't going to get you anywhere in this department!" and "You females are worthless!"  (Second Am. Compl. ¶ 64.)  Although Ivan was severely distressed by this incident, turning to several officers nearby for assistance in restraining Allen, (Bradshaw Cert., Ivan, Ex. I 283:22-25.), she did not report this incident for over a year, until April 16, 2001.

In December, 2000 or January, 2001, Ivan clashed with Allen again while delivering a prisoner to the criminal courthouse.  Transportation officers were not allowed above the basement level but, because the basement women's bathroom was closed by flooding, Ivan went to the first floor to use the bathroom.  (Bradshaw Cert., Ex. I, Ivan Dep. 369:6-370:9.)  Allen encountered Ivan on the first floor, blocked access to the bathroom and told her to "hold it and get out of his building." (Nulty Cert., Ex. C 383:9-383:16.)    Ivan did not report this incident.

-4-

FOR PUBLICATION

On April 16, 2001,  Allen witnessed Ivan behind a lieutenant's desk and offered "that's where you should be, behind the desk like a secretary."  (Second Am. Compl. ¶ 71.)   Later, upon learning that Ivan planned to take her son to Disneyland, Allen offered, "Oh, I can't believe you could reproduce... he must be a poor kid to have a mother like you."  (Nulty Cert., Ex. C 476:13 to 477:3.)  In response to Ivan's request that he stop, Allen retorted "What? I thought you were one of the guys.  What, you can't take it?"  (Compl. ¶ 75.)

After this incident Ivan complained about Allen's behavior and on, May 3, 2001, Undersheriff Falcone ordered that there be no contact between the two.  (Bradshaw Cert., Ex. I, Ivan Dep. 525:17-22.)  Ivan was prohibited from working at the criminal courthouse and was required to notify Allen whenever her other duties required her to be there.   (Second Am. Compl. ¶ 83.)  Ivan initially expressed satisfaction with this solution but ultimately felt that the policy stigmatized her.  (Bradshaw Cert., Ex. I, Ivan Dep. 526:13-18, 593:8-14.)  In a final act of harassment, on November 16, 2001, Alteria and Ivan reported to the courthouse to transfer a prisoner and Allen shouted derogatory and gender-based comments across the parking lot in Ivan's direction.  (Compl. ¶ 89-92; Nulty Cert., Ex. YY.)

Allen also made other troubling comments, although they were not directed toward Ivan specifically.  Sheriff's officer Villegas testified that Allen said "broads don't belong here." (Nulty Cert., Villegas, Ex. F 68:19 to 69:10.)  According to the testimony of Sheriff's Officer Alteria, Allen was "more harsh, more critical" of female officers, stated that female officers should not be in law enforcement, and would make comments about the appearance of female officers, including officer Ivan, suggesting that "he would like to see them out of their

FOR PUBLICATION

uniform[s]."  (Nulty Cert., Ex. D, Alteria Dep. 69:5-69:14; 69:24-70:7; 70:25-71:15; 74:8-74:22;

220:18-222:11.)

There is some evidence that Allen did not reserve his boorish behavior for his female

coworkers.  An investigative report concluded that Allen "appear[ed] to have a command

management style that ha[d] been variously described as being tough, strong, nasty, bullying,

condescending, arrogant, intimidating, that at times [could] be petty, arbitrary or capricious."  It

also "appear[ed] that he generally treat[ed] male and female officers alike with his abrasive

style." (Bradshaw Cert., Ex. F at 10.)

However, on March 26, 2002, Director of Personnel for the County, J. Thomas Cross

wrote to Sheriff Spicuzzo indicating his initial finding that Allen's conduct towards Ivan had

violated the County's sexual harassment policy.  Director Cross recommended that Allen receive

sensitivity training and a written reprimand.  Despite this recommendation, Allen was not

disciplined.  Instead Undersheriff Falcone told Allen that Sheriff Spicuzzo had decided not to

take any action against him.  (Nulty Cert., Ex. JJ at 349:25-350:9.)

**<u>Jazikoff</u>**

Plaintiff Jazikoff was first employed as a sheriff's officer in the Department in April of

2000, (Second Am. Compl. ¶ 15.), and continued in that position until her disability retirement

on September 8, 2006.  (Statement of Facts in Opp'n at 1.)  Jazikoff claims direct harassment by

three members of the department, Lieutenant Blount and sheriff's officers Landis and Pepenella.

Similarly to Allen's harassment of Ivan, Blount's alleged harassment involved a series of

inappropriate comments while he was Jazikoff's supervisor.  On March 3, 2003, Blount told

FOR PUBLICATION

Jazikoff she was "going to be fucked all night long."  (Second Am. Compl. ¶ 46.)  Blount would

often ask if Jazikoff's mood was because "she was on the rag" or if it was "that time of the

month" and once noted that his ATM PIN number was 6969, apparent reference to the sexual

connotation of "69."  (Nulty Cert., Ex. J, Jazikoff Dep. 1810:6-12; 1819:24-1821:3.) On another

occasion, when Jazikoff was in street clothes, Blount made comments similar to "Oh my God,

you look different out of uniform" and "Your ass looks great in those jeans."  (Nulty Cert., Ex. K

at ¶ 11.)

Blount also enlisted his authority as Jazikoff's supervisor in his harassment.  Once during

roll call, Blount ordered Jazikoff to turn around in front of him.  (Nulty Cert., Ex. K at ¶ 3.)

Other officers were not asked to do the same.  (Nulty Cert., Ex. L, Martin Dep. 32:17-34:23; Ex.

M, Mayo Dep. 29:3-31:16.)  On another occasion, several male officers were looking at

magazine depicting, in Jazikoff's words, "provocatively dressed" women.  One of the officers

asked Blount which one he would "pick."  Blount queried in response, "which one looks most

like Jazikoff?"  (Nulty Cert., Ex. K at ¶ 22; Ex. J, Jazikoff Dep. 797:18 to 798:20.)  A few

minutes later Blount, claiming to have read the County's sexual harassment policy, said he

realized that he was not allowed to say that and amended his comment, "that's not Jazikoff, that's

her twin sister."  (Nulty Cert., Ex. K at ¶ 22; Ex. J, 802:10 to 805:7.)  Finally, while conducting

instruction in weapon maintenance, as he applied oil to the barrel of a gun, Blount said "this is

the way you have to do it," and "you have to jerk it off hard."  (Nulty Cert., Ex. K at ¶ 27.)

Harassment by Landis consisted of both inappropriate comments and physical contact.  In

the spring of 2001, Landis told Jazikoff, "I feel like bending you over this patrol car and giving

FOR PUBLICATION

you a good one" and "I think you're the kind of girl who likes dirty sex all night."  He then

feigned moaning while touching himself.   (Nulty Cert., Ex. J, Jazikoff Dep. 132:23-134:4.)   In

response to Jazikoff's complaints about this behavior, Blount said that he was not surprised but

that Jazikoff should just ignore it, waiving off the behavior as "Buzzy [Landis] being Buzzy."

(Nulty Cert., Ex. K at ¶ 1.)  Jazikoff did not formally report this incident.  Landis later left a

phone message on Jazikoff's home phone intimating that he and Jazikoff had a date later that

evening.  Jazikoff's husband heard this message causing some distress.  (Nulty Cert., Ex. K at ¶

6.)

        In June or July of 2001, Landis came up behind Jazikoff, pressed his pelvis against her

back, picked up a cookie that Jazikoff was eating and smeared it on his face suggestively.  He

then asked Jazikoff, "Are you hungry?  I'll give you something to eat." and added "This is like

eating you."  Landis then leaned close to Jazikoff and attempted to lick her ear.  (Nulty Cert., Ex.

K at ¶ 7.)  Jazikoff claims that she failed to report this incident for fear of retaliation.  (Second

Am. Compl. ¶ 23.)  On August 31, 2001,  Landis called out "Hey Jaz," pulled down his pants and

underwear and bent over.  (Nulty Cert., Ex. K at ¶ 8.)  Jazikoff reported the incident orally to

Lieutenant Consalvo.  (Bradshaw Cert., Ex. L, Jazikoff Dep. 229:5-21.)

        In comparison with the behavior of the other defendants, Pepenella's actions were

relatively tame.  Jazikoff was partnered with Pepenella in January of 2003.  Pepenella attempted

to hold her hand, called her his girlfriend, (Nulty Cert., Ex. K at ¶ 18.), and would discuss oral

sex.  (Nulty Cert., Ex. J 2236:8-22.)  Other officers testified that they were not surprised by these

actions based on Pepenella's reputation.  In answer to Jazikoff's complaints, Blount

-8-

FOR PUBLICATION

acknowledged that he had expected Pepenella to harass Ivan.  (Nulty Cert., Ex. K ¶ 19.)  On

February 23, 2003, Blount assigned officer McDermid, allegedly Pepenella's close friend, to

replace Pepenella as Jazikoff's partner.  Jazikoff claims that McDermid continued to harass her

but details only insignificant instances of harassment.  (Compl. ¶¶ 44-45.)

**The Atmosphere of the Department**

More generally, plaintiffs claim that the atmosphere in the Department was sexually

charged.  Adult magazines, like Playboy, and mens' magazines such as Maxim and Easy Rider

were common in the Department.  (Nulty Cert., Ex. N, McDermid Dep. 78:3-79:18; Ex. L,

Martin Dep. 41:5 -43:19; Ex. E, Netta Dep. 49:24-52:21; Ex. M, Mayo 43:1-12; Ex D, Alteria

Dep. 114:4-115:23, 117:6-118:18).  A list of violent sexual activities, in an apparent attempt at

humor, was displayed in the station and Lieutenant Mullen posted pictures of scantily clad

women in his office.  (See Nulty Cert., Ex. Q; Ex. R.)

Several members of the Department also made comments either related to gender or of a

sexual nature.  Blount referred to his paycheck as being for "cunt number one" and "cunt number

two," apparent reference to his two ex-wives.  (Nulty Cert., Ex. J 1812:17 to 1813:2.)  Allen

suggested that Lieutenant Dawn Sidders was a lesbian and, in refusing to allow officer Michelle

Kardos to serve at the same time as Sidders, worried that Kardos would "take care of Sidders

under the desk."  (Nulty Cert., Ex. K at ¶ 2.)  According to sheriff's officer Alteria, Landis would

make comments about women and spent most of the day looking at their breasts and buttocks

while commenting on what they might be like in bed.  (Nulty Cert., Ex. D, Alteria Dep. 97:24-

100:4.)

**Policies and Customs of the Department**

FOR PUBLICATION

The Department had responsibility for transporting prisoners between the Middlesex County Correctional Facility and the Superior and Municipal Courts within Middlesex County. (Nulty Cert., Ex. V, Expert Report of Francis R. Murphy ("Murphy Report").)   Several of the Department's written policies differentiated on the basis of gender.  General Order ("GO") 60:4.4 "Arrest Procedures" required that female officers search female prisoners and male officers search male prisoners whenever practicable.  (Murphy Report at 6.)  While Department policy acknowledged that the law might not require this differentiation, GO 70:4.1 concluded that "common sense" suggested searches of female prisoners by male officers be avoided.  GO 6:11.2 "Processing Female Prisoners" required that female prisoners be searched and transported by female officers when possible and other GO also reflected this policy.  (Murphy Report at 7-9.)

Unwritten policies of the department differentiated based on gender as well.  Custom did not allow female officers to work as partners, (Murphy Report at 10-11.), and required a female sheriff's officer on duty for each of the Department's three shifts. (Murphy Report at 11.)  The need to have female officers available for transports and searches resulted in other differential treatment.  First, Sheriff Spicuzzo conceded that gender played a role in determining how posts were filled and that female officers who were more qualified than male officers had been denied opportunities.  (Nulty Cert., Ex. X, Spicuzzo Dep. 63:24-64:18.)  As example, Jazikoff did not receive training that other officers received purportedly because she would be limited to working in the Transportation Division.  (Nulty Cert., Ex. K ¶ 4.)

Second, the Department maintained a separate mandatory overtime list so that there would be sufficient female officers to satisfy the search and transportation policies.  (Nulty Cert., Ex. Y, Sathan Dep. 57:9-58:5.)  Both Falcone and Spicuzzo acknowledged that female officers

-10-

FOR PUBLICATION

worked more hours because of this policy, (Nulty Cert., Ex. X, Spicuzzo, 226:19-227:12.; Ex. W,

Falcone Dep. 75:22-76:16.), and would often be held over after hours.  (Nulty Cert., Ex. J,

Jazikoff 652:23-653:12; 669:22-670:23.)  Additionally, unlike male officers, female officers

exerted no more control over their schedule as they gained seniority.  (Murphy Report at 15.)

Jazikoff often worked double shifts and hours of forced overtime to ensure that a female officer

was available.  (Nulty Cert., Ex. J, Jazikoff Dep. 357:5-358:21.)  Both Spicuzzo and Falcone

testified that the policy was justified by a desire to avoid allegations of sexual harassment.

(Nulty Cert., Ex. W, Falcone Dep. 92:5 to 93:1, Ex. X, Spicuzzo Dep. 208:6 to 210:13.)

**Sexual Harassment Policy**

The County had promulgated a sexual discrimination policy.  The policy was distributed

to all County agencies, of which the Department was one.  Every employee was supplied with a

copy and training in the policy was supplied.  (See Bradshaw Cert., Ex. C; Ex. D; Ex. E.)

However, Plaintiffs introduced evidence that the policy was unevenly enforced and that the

Department failed to effectively implement the policy.  The very people who were charged with

enforcement often committed violations.  Plaintiffs also claim that the Department failed to

investigate complaints adequately.  Ivan's complaint about Allen was not investigated in a timely

fashion.

The anti-harassment policy mandated that investigations be completed within 30 days

"but in no event shall exceed 45 working days ... without consent or compelling circumstances",

(Nulty Cert., Ex. EE, 1:28-5(E)(5).), but the investigation into Ivan's allegations was not

completed for over 10 months.  (Nulty Cert., Ex. II, Alai Dep. 73:8-18.)  Even though the

investigation ultimately concluded that Allen violated anti-harassment policy and recommended

FOR PUBLICATION

sensitivity training, punishments were not imposed, nor did Director Cross have the power to

impose punishment.  (Nulty Cert., Ex. JJ, Allen Dep. 349:25-350:20; Ex. BB, Cross Dep. 83:8 to

85:6.)  After Jazikoff disclosed her complaints about Landis to Holly Alai of County Personnel,

Alai informed Undersheriff Falcone of Jazikoff's complaint even though the sexual harassment

policy required confidentiality.  (Nulty Cert., Ex. EE, 1:28-8.)  Falcone then berated Jazikoff for

her complaint.  (Nulty Cert., Ex. K, ¶11.)

        Although Jazikoff never formally complained about Pepenella and Blount, an

investigation was conducted in response to her informal complaints.  This investigation

ultimately focused only on Pepenella and the Magazine Incident and Alai based the report solely

on interviews with Falcone, Pepenella and McDermid.  (Nulty Cert., Ex. CC, Alai Dep. 107:16-

21.)  Alai failed to interview sheriff's officer Martin who could have testified not only as to

Pepenella's actions but also that Jazikoff had complained to Blount about Pepenella, (Nulty

Cert., Ex. L, Martin Dep. 101-104:7.), and misrepresented information provided by McDermid.

(Nulty Cert., Ex. MM.)  Alai's report on the magazine incident accepted events as described in

Falcone's memorandum and again contained misrepresentations.  (Id.)

**<u>Retaliation</u>**

        Both Jazikoff and Ivan further assert that they were subjected to retaliation for

complaining about harassment.  Ivan claims first that she was retaliated against via the

stigmatization of the separation order, the incident involving the courthouse bathroom, threats by

Falcone that future complaints would result in reprisals and other minor incidents of harassment.

(Nulty Cert., Ex. G ¶ 11.)  Ivan complains second that, in response to her EEOC charges and

federal complaint, she was inappropriately brought up on charges for failing to report her partner

-12-

FOR PUBLICATION

for smoking in their patrol car (the "Smoking Incident") and provided treatment different from her peers in her firearm qualification and as a result ultimately terminated.  (See Nulty Cert., Ex. X, Spicuzzo Dep. 348:2-14; see also Ex. AAA; Ex. BBB)   Ivan brought an administrative appeal of both of these purported reprisals.  Office of Administrative Law Judge Blake found that Ivan's termination was justified by her failure to qualify on her firearm but that Ivan's punishment for failure to report the Smoking Incident was the product of Sheriff Spicuzzo's "personal animus" toward Ivan.  (Nulty Cert., Ex. CCC.)

Jazikoff's allegations of retaliation are more general.  In September 2001, Jazikoff submitted complaints regarding harassment by Landis, the incident involving the cookie and mooning incident.  (Nulty Cert., Ex. QQ.)  On October, 16, 2001, Jazikoff appeared at a hearing and later met with Alai.  On October 23, 2001, Jazikoff was informed that she was being brought up on disciplinary charges relating to the mooning incident. (Nulty Cert., Ex. K at ¶ 11.) Although no formal charges were ultimately declared against Jazikoff, they were asserted against the other officers present.  (Bradshaw Cert. at xxvi, Ex. M; Ex. N & Ex. O.)  Jazikoff also claims that she was blocked from employment with the Sayreville Police Department in response to the incident.  (Bradshaw Cert., Ex. P.)  Around the same time, Falcone stated to Jazikoff, "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us?  You think you might have a case?  Try it, go for it.  You will never ever win.  No jury would ever find me or my department guilty of this female bullshit."  (Nulty Cert., Ex. K at ¶ 11.)  In November and December of 2002, Jazikoff was denied timely requests for vacation and personal days.  Finally, in response to Jazikoff's complaints about Pepenella's harassment, Blount partnered Jazikoff with McDermid, although Blount knew that McDermid

FOR PUBLICATION

had disdain for Jazikoff.  (Nulty Cert., Ex. K ¶¶ 22; 24.)  After the magazine incident, Blount

told Jazikoff "Now we're even."  (Nulty Cert., Ex. K ¶ 22.)

On April 11, 2003, Jazikoff filed her EEOC charge.  From May, 2003 to November,

2003, Jazikoff was out on medical leave.  (Nulty Cert., Ex. J, Jazikoff Dep. 574:15-575:13.)

Upon Jazikoff's return she was singled out as "house bitch"[2] and given significant amounts of

filing work in the basement.  The basement was not a pleasant assignment, (Nulty Cert., Ex. N,

McDermid Dep. T38:7-25.), and was regarded as a punishment.  (Nulty Cert., Ex. L, Martin

T55:5-56:9.) Jazikoff alleges a number of other reprisals, including taunting and other

harassment by coworkers, refusals to accommodate sick leave, Undersheriff Falcone's ordering

movement of Jazikoff's workspace and files, premature clearance of Jazikoff from medical leave,

threats of discipline for marginal infractions, denial of shift change requests, and a lack of

accommodation for family emergencies.  (See, e.g., Nulty Cert., Ex. K. ¶¶ 32-33, 45-47, 50, 52,

54, 60; Ex. UU; Ex. WW.)

**Complaints**

On April 16, 2003, plaintiffs filed their complaint in this Court.  (Dkt. No. 1 (filed

Apr.16, 2003).)  Plaintiffs set forth eight causes of action pursuant to the New Jersey Law

Against Discrimination (the "LAD").  (Id.; See N.J.S.A. 10:5-1 et seq..)    In Counts One and

Two, plaintiffs alleged a hostile work environment.  In Counts Three and Four plaintiffs alleged

that the County and Department, by and through employees, engaged in a pattern and practice of

---

[2]Department custom was to designate any non-partnered or "odd" officer to be "House
Bitch."  (Nulty Cert., Ex. K at ¶ 5; Ex. M 35:11-22.)  Despite its allegedly derogatory name,
officer May testified that "basically it was kind of cool to be the HB; you sat around and did
nothing.  You got the lieutenant coffee.  If he wanted dinner, you got him dinner, and do [sic]
paperwork."  (Nulty Cert., Ex. M, Mayo Dep. 35:11-22.)

**FOR PUBLICATION**

unlawful sexual discrimination.  At Count Five Ivan alleged that Spicuzzo, Falcone, Blount and Allen were individually liable to Ivan for aiding and abetting violations of the LAD.  Count Six alleged that Spicuzzo, Falcone, Blount, Landis and Pepenella were similarly individually liable to Jazikoff.  At Counts Seven and Eight, plaintiffs alleged retaliation in violation of the LAD.

Plaintiffs set forth six federal claims as well.  Counts Nine and Ten alleged equal protection violations, Counts Eleven and Twelve, unconstitutional retaliation and Counts Thirteen and Fourteen, unconstitutional conspiracy.

On January 8, 2004, plaintiffs filed their Amended Complaint, adding Count Fifteen, on behalf of plaintiff Ivan, for retaliation in violation of the Conscientious Employee Protection Act ("CEPA") (Dkt. No. 10 (filed January 8, 2004); N.J.S.A. 34:19-1 et seq..)  On November 16, 2007, plaintiffs filed a Second Amended Complaint, adding Counts Sixteen and Seventeen on behalf of plaintiff Jazikoff, alleging failure to accommodate a disability in violation of both the American with Disabilities Act, 42 U.S.C. 12101 and the LAD.  On January 22, 2008, plaintiff Jazikoff filed a Voluntary Stipulation of Dismissal without prejudice as to these last two counts.[3]

Plaintiffs seek compensatory and punitive damages.  Additionally, plaintiffs seek injunctive relief against the department to cease the alleged discrimination, placement of Department in receivership for purposes of instituting an education program, appointment of an independent consultant to develop anti-harassment policies and reinstatement of both Ivan and Jazikoff.

**Motions**

---

[3]Defendants also make a series of cross-claims among themselves.  As these cross-claims are not the subject of any pending motions the Court does not address them here.

**FOR PUBLICATION**

Defendants have made a series of motions for summary judgment.  Defendant the County of Middlesex has moved for summary judgment on any claims for acts of harassment occurring before Ivan and Jazikoff started working at the Department.  (Dkt. Entry Nos. 125 & 126 (filed January 15, 2008).)  Defendants the County, the Department and Sheriff Spicuzzo have moved for summary judgment with regard to Counts One through Six.  (Dkt. Entry No. 134 (filed January 31, 2008).)  Defendant Blount has moved for summary judgment with regard to Counts Seven, Eleven, Thirteen, Fourteen and Fifteen. (Dkt. Entry No. 138 (filed January 31, 2008).)  Defendant Falcone has moved for summary judgment with regard to Counts Seven, Eight, Nine, Ten and Twelve (Dkt. Entry No. 139 (filed January 31, 2008).)  All defendants have joined in each of these motions.  (Dkt. Entry Nos. 131-33; 135; 137; 140 (filed January 31, 2008); Dkt. Entry No. 141 (filed February 1, 2008.)  For their part, plaintiffs have moved for summary judgment with regard to Count Fifteen.  (Dkt. Entry No. 136 (filed January 31, 2008).)

**LEGAL STANDARD**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-moving party, and it is material if, under the substantive law, it would affect the outcome of the suit.  Id. at 248.  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

FOR PUBLICATION

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). To survive a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

**DISCUSSION**

**Acts Occurring Before Plaintiffs' Respective Terms of Employment**

Defendants move for summary judgment on any claims arising from acts of harassment directed at Jazikoff and Ivan that occurred before Jazikoff and Ivan were employed by the Department, in January 2000 and July 1999, respectively. Defendants' counsel certifies that

FOR PUBLICATION

plaintiffs have not asserted any such claims. (Defs.' Motion for Partial Summ. J., Certification of

Lawrence F. Citro, Esq., Statement of Undisputed Facts ¶¶ 5-6 (Dkt. No. 125, filed Jan. 10,

2008); Defs.' Motion for Partial Summ. J., Certification of Lawrence F. Citro, Esq., Statement of

Undisputed Facts ¶¶ 5-6 (Dkt. No. 126, filed Jan. 10, 2008) (collectively "Citro Cert.").)

Plaintiffs do not dispute the dates that Jazikoff and Ivan began working for the Department but

do contest defendants' assertion that any such acts are irrelevant to determination of plaintiffs'

liability.  Plaintiffs further assert that defendants cannot request dismissal of claims which they

simultaneously certify have not been asserted by plaintiffs.

It is undisputed that Jazikoff and Ivan have not asserted any claims for harassment based

on acts committed before the beginning of their respective terms of employment.  (See Citro

Cert.)  Yet alleged acts of harassment occurring before Jazikoff and Ivan worked in the

Department could be relevant to a hostile work environment claim because they might tend to

establish that the County and Department knew of harassment in the Department.  If the

Department or County were negligent or reckless with regard to such harassment they could be

liable for compensatory or punitive damages.  See Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587,

620, 626 A.2d 445 (1993); see also Restatement (Second) of Agency § 218(d).  The County's

motion must be denied.

**LAD Claims**

*1.*    *Statute of Limitations*

Defendants argue that any of plaintiffs' claims under the LAD for events that occurred

before April 16, 2001 are time barred.  Plaintiffs argue that, under the "continuing violation

doctrine," their claims are timely because acts are part of a pattern of discrimination.

-18-

FOR PUBLICATION

a.      *Standard*

Under the "continuing violation doctrine," a plaintiff "may pursue a claim for

discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part

of a pattern and at least one of those acts occurred within the statutory limitations period."

Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 6-7, 803 A.2d 611 (2002) (citing West v.

Philadelphia Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).  "When an individual is subject to a

continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run

until the wrongful action ceases."  Shepherd at 18 (quoting Wilson v. Wal-Mart Stores, 158 N.J.

263, 272, 729 A.2d 1006 (1999).  Hostile work environment claims differ from discrete acts like

failure to promote, denial of transfer, or refusal to hire.  Shepherd at 18-20 (citing Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 114-18, 122 S. Ct. 2061 (2002)).  Because hostile

work environment claims arise from cumulative harassment they fit readily into the continuing

violation theory.  See Rush at 481. As long as an act that contributes to a hostile work

environment occurred during the statutory period it does not matter that some of the component

acts occurred outside the statutory period.  Id.

On the other hand, such acts must be more than just isolated or sporadic incidents of

harassment.  Bolinger v. Bell Atl., 330 N.J. Super 300, 307, 749 A.2d 857 (App. Div. 2000);

Beck v. Tribert, 312 N.J. Super. 335, 346, 711 A.2d 951 (App. Div. 1998).  Discrete

discriminatory acts are time barred even if they are somewhat related to acts alleged in a timely

fashion.  Morgan, 536 U.S. at 113; Sgro v. Bloomberg, 2008 WL 918491, *6, 2008 U.S. Dist.

LEXIS 27175, *14-15, No. 05-731 (FLW) (March 31, 2008, D.N.J.).

The Third Circuit has adopted a three-factor test published by the Fifth Circuit in Berry v.

FOR PUBLICATION

Board of Supervisors of Louisiana State Univ., 715 F.2d 971 (5th Cir. 1983), aff'd, 783 F.2d

1270 (5th Cir. 1986).  See Rush, 113 F.3d at 481.

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuous violation? The second is frequency. Are the alleged acts recurring .. . or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence.  Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

Id., 715 F.2d at 981.

     *b.*     *Analysis*

Defendants filed their federal complaint on April 16, 2003.  The statute of limitations on

sexual harassment claims under the LAD is two years.  See Montells v. Haynes, 133 N.J. 282,

627 A.2d 654 (1993).  Any claims for acts occurring before April 16, 2001 are time barred unless

the continuing violation doctrine applies.  Many of the events underlying Ivan's claim occurred

before April 16, 2001, including Allen's comments between August and November of 1999 that

Ivan looked "disgusting," comments in connection with the military birthday party, his behavior

at the Galway retirement party and the courthouse bathroom incident.  But harassment of Ivan

continued after April 16, 2001.  In May, 2001, Undersheriff Falcone instituted the separation

order and, on November 16, 2001, Allen shouted derogatory language at Ivan.  The harassment,

with incidents spanning all four years of Ivan's employment, were sufficiently frequent and

similar in subject matter to constitute a pattern.  Each incident of harassment of Ivan was

perpetrated by Allen and was gender- or sex-related.  Additionally, none of the acts alleged were

permanent or discrete enough to put Ivan on notice to assert her claim.  The Court is convinced

**FOR PUBLICATION**

that these incidents may be considered by the fact finder part of a pattern of discrimination

sufficient to constitute a continuing violation.  Accordingly, Ivan's claims are timely.

The majority of the harassment directed at Jazikoff happened during the statutory period.

In any event, Jazikoff, similarly to Ivan, alleges harassment before April 16, 2001 that is not only

related in subject matter but also conducted by the same parties who engaged in harassment after

such date.  Harassment by Landis beginning in the spring of 2001, as well as harassment by

Blount and Pepenella continued well into the statutory period.

Defendants, in arguing that any events occurring before the statutory period were discrete,

point to two cases where courts found that events falling outside the statutory period were not

part of a continuing pattern.  (Defs.' Reply 11 (citing Cortes v. Univ. of Med. & Dentistry, 391 F.

Supp. 2d 298 (D.N.J. 2005); Hall (Estate of Potoczak) v. St. Joseph's Hosp., 343 N.J. Super. 88,

104, 777 A.2d 1002 (App. Div. 2001)).

Both Cortes and Hall can be distinguished from this case.  In Cortes, the discriminatory

acts occurring before the statutory period were committed by different parties and were topically

unrelated.  The acts of harassment found commonality only in that they were directed at the

plaintiff.  See Cortes, 391 F.Supp.2d at 308-09.  Here, earlier acts bear a much stronger

connection to those that happened during the statutory period.  Unlike Cortes, many of the acts of

discrimination before the statutory period were performed by the same parties who continued to

harass plaintiffs later.  Moreover, all of the harassment of Ivan and Jazikoff related to the same

subject matter, sex or gender.  See Berry, 715 F.2d at 981.

Hall can be distinguished because it involved a discrete act of discrimination that put

plaintiff on notice to take action.  See Hall, 343 N.J. Super. at 104-105.  The Hall plaintiff had

**FOR PUBLICATION**

been denied an interpreter.  Id.   The court held that the continuing violation doctrine did not

apply because plaintiff could reasonably have known that act was discriminatory and brought suit

at the time of the first act of discrimination.  Id.  In contrast, plaintiffs have alleged a hostile work

environment based on a series of comments and actions that form a pattern.  This type of claim

fits readily into the continuing violation doctrine.  See Rush, 113 F.3d at 481.  Plaintiffs' claims

under the LAD are not barred by the statute of limitations.

*2.      Counts One & Two: Hostile Work Environment*

At Counts One and Two, plaintiffs seek equitable relief and compensatory and punitive

damages based on a hostile work environment.  As an initial matter, defendants argue that

summary judgment is appropriate with regard to any individual liability under the LAD of

defendants Spicuzzo, Falcone, Blount, Allen, Landis and Pepenella because the LAD does not

impose individual liability on co-employees. See Tyson v. CIGNA Corp., 918 F. Supp. 836, 839-

40, n.4 (D.N.J. 1996).  Plaintiffs have abandoned any such claims against Pepenella and Landis.

(Pls.' Opp. 71 n.10.)  Spicuzzo, Falcone, Blount and Allen as supervisors, can only be

individually liable under the LAD to the extent that they aided and abetted violations of the LAD

while acting with the scope of their employment.  See Tyson, 918 F. Supp. at 839-40, n.4.

Plaintiffs' claims for aiding and abetting are addressed below.  All claims against Pepenella and

Landis under the LAD, and all claims against Spicuzzo, Falcone, Blount and Allen individually

under Counts One and Two, are dismissed.  The actions of the individual defendants can still

form the basis of liability for the County and/or the Department if they contributed to a hostile

work environment.

a.      *Standard*

FOR PUBLICATION

"To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." Lehmann, 132 N.J. at 603.  Plaintiffs must show that "the complained-of conduct (1) would not have occurred but for [her] gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04.

A plaintiff must show only that a reasonable woman would believe that conditions have been altered, Baliko v. Inter'l Union of Operating Eng'rs, 322 N.J. Super. 261, 277-78, 730 A.2d 895 (App. Div. 1999), not that there were tangible adverse changes or the loss of a tangible benefit.  A plaintiff may meet her burden via evidence that other women in the workplace were harassed.  Lehmann at 610.  Plaintiff need not personally have been the target of each *or any* instance of offensive or harassing conduct.  Lehmann at 611.  As example, if discriminatory statements were made in the presence of another supervisor, a reasonable juror could conclude that the target of such comments would perceive the working environment as hostile and abusive. See Taylor v. Metzger, 152 N.J. 490, 506-07, 706 A.2d 685 (1998).

In determining whether plaintiff has adduced evidence sufficient to establish an objectively hostile or abusive work environment, the court must examine the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hargrave v. County of Atlantic 262 F. Supp. 2d 393, 413 (D.N.J. 2003) (citation omitted).

FOR PUBLICATION

b.      *Analysis*

The present inquiry is limited to whether the plaintiffs have produced sufficient evidence to support a hostile work environment claim against the Department and the County, not as against any individual defendant.  None of the individual employees of the Department can be individually liable except the supervisors Spicuzzo, Falcone, Blount and Allen and even then only to the extent that they aided and abetted the harassment.  Although the evidence with regard to any one employee may be thin, each individual incident of harassment can support plaintiffs' larger hostile work environment claim against the Department and County even if the individual allegation could not support a claim on its own.  It is not necessary for the Court to examine whether each incident of harassment standing alone could support a hostile work environment claim.  Be that as it may, the evidence is sufficient for both plaintiffs to survive this motion for summary judgment.

i.      *Ivan*

With regard to Ivan, defendants argue that plaintiffs have failed to meet the severe or pervasive threshold.  According to defendants, the incidents alleged are isolated and, at worst, annoying. Plaintiffs argue that, when viewed in the "totality of the circumstances," the record shows severe or pervasive harassment.

The severe or pervasive standard is disjunctive.  See Lehmann at 606.  The severity or seriousness required varies inversely with the pervasiveness.  See Lehmann at 607.[4]  One

_____

[4]Lehmann expressly rejected the Andrews court's "regular *and* pervasive" standard.  See Lehmann at 606 (emphasis added).  Defendants cite Andrews for the proposition that conduct must be "severe enough to affect the psychological stability of a minority employee."  (Def.'s Supp. 5-6. (citing Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)).)  It is not entirely clear if the Lehmann court abandoned this characterization of the severity required but

-24-

FOR PUBLICATION

particularly severe comment could be enough to meet the standard.  See Taylor, 152 N.J. at 502-503 (holding that one reference to employee as "jungle bunny" by a supervisor could support a hostile work environment claim).

It is the "*harassing conduct* that must be severe or pervasive," not its effect.  See Lehmann at 606 (emphasis in original).  However, the court must consider cumulative effect, keeping in mind "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." Lehmann at 607.  Even where a plaintiff testifies that incidents occurred "every so often," the cumulative effect of incidents may be enough to satisfy this prong. Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 271, 675 A.2d 684 (App. Div. 1996).

There is a limit to these inferences.  However, "simple teasing, offhand comments, and [non-serious] isolated incidents" do not meet the bar. See Hargrave, 262 F.Supp.2d at 413 (quoting Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 280 (internal quotations omitted)).  "What is illegal is a 'hostile work environment' not an 'annoying work environment.'" Lynch v. New Deal Delivery Service, 974 F. Supp. 441, 452 (D.N.J. 1997) (Walls, J.) (holding that no reasonable jury could conclude that behavior was severe or pervasive when supervisor had made several phone calls to plaintiff at night; invited plaintiff to workout, have dinner and divulged that his marriage was falling apart; made comments about having to

---

the Lehmann court did make clear that "it is the harassing conduct that must be severe or pervasive, *not its effect* on the plaintiff or on the work environment," Lehmann at 606 (emphasis added), and that "employees need not endure sexual harassment until their psychological well-being is seriously affected to the extent that they suffer anxiety or debilitation." Lehmann at 610 (citing Ellison, 924 F.2d at 878)).

FOR PUBLICATION

fire a secretary who was "too pretty"; and where plaintiff had seen a supervisor "put his hands on

women").

When an act is done by a supervisor its severity may be exacerbated because the

supervisor has a unique role in shaping the work environment.  See Taylor, 152 N.J. at 691-92;

see also Flizack v. Good News Home for Women, Inc., 346 N.J. Super. 150, 160, 787 A.2d 228

(App. Div. 2001); see also Leonard v. Metropolitan Life Ins. Co., 318 N.J. Super. 337, 345, 723

A.2d 1007 (App. Div. 1999) ("the severity of the remarks was underscored by the fact that they

were uttered by plaintiff's supervisor").

Ivan has produced sufficient evidence for a fact finder to determine that Allen's conduct

was severe or pervasive.  As detailed earlier, starting in November of 1999 and continuing until

2001, Allen made a series of comments to and about Ivan that were either gender-based or

facially sexual.  To be sure, certain of the incidents, if viewed on their own might be insufficient

satisfy Lehmann.  As example, Allen's comments to Ivan regarding her appearance, while

perhaps mean-spirited, could be viewed as instructions to a subordinate to comply with the

Department's policy. In contrast, other incidents, in particular Allen's comments to officer Netta

that Ivan needed a "good stiff fucking" and was "sucking her way to the top," his behavior at the

Galway retirement party, his comments about Ivan's son and other comments that expressed his

views as to Ivan's proper gender role are much more severe.   Importantly, many of these more

severe incidents are also facially sexual.

Because the alleged incidents are so severe they need be less pervasive.  See Lehmann at

607.  Even if they were less severe, when Allen's behavior is viewed in the "totality of the

circumstances," the incidents alleged would be sufficiently pervasive.  Plaintiff alleged a

FOR PUBLICATION

significant number of incidents occurring over the course of four years.  The Court will not read the LAD to require more to survive summary judgment as a matter of law.

Defendants rely on Morales-Evans v. Administrative Office of the Courts of New Jersey (102 F. Supp. 2d 577 (D.N.J. 2000) to argue that the acts that plaintiff relies upon are not related by either temporal proximity or subject matter.  In Morales-Evans, however, the allegations of sexual discrimination were both less severe and less pervasive than the allegations in this case. C.f. Morales-Evans at 589.  The plaintiff's claims in Morales-Evans were limited to unwanted romantic advances from a co-worker before her employment; four or five unwanted kisses on the cheek; a remark that another office staffer who had tried to kiss plaintiff probably couldn't help himself because plaintiff was "so voluptuous" and that he was probably attempting to get his tongue in plaintiff's "gap"; two comments relating sneezing and sexual intercourse; and comments about a visit to a nude beach.  Morales-Evans at 581-83, 89-90.   While these allegations are arguably offensive, none rises to the level of Allen's comments to Ivan that she was "sucking her way to the top" or his conduct at the Galway retirement party..

Defendants also suggest that plaintiffs have failed to show that harassment was because of Ivan's gender, arguing, in effect, that Allen engaged in equal opportunity harassment.  To satisfy the first prong of Lehmann, a plaintiff must "show by a preponderance of the evidence that she suffered discrimination because of her sex." Lehmann 132 N.J. at 604; Woods-Pirozzi, 290 N.J.Super. at 266.  What "is required is a showing that [plaintiff's] gender was a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner." Hargrave, 262 F. Supp. 2d at 412 (quoting Aman Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)).   Accordingly, if the party who committed the

FOR PUBLICATION

allegedly discriminatory act is equally crude to all employees there is no basis for a LAD claim.

See Lehmann,132 N.J. at 604; see e.g., Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 (7th

Cir. 1999) (general mistreatment not motivated by sex or race because plaintiff was not singled

out for abuse); Boyce v. New York City Mission Society, 963 F. Supp. 290 (S.D.N.Y. 1997)

(yelling, cursing, belittling of plaintiff's doctoral degree, assigning secretarial duties, indicating

she was not liked and pounding on office door were not related to gender).

        Where the conduct is "sexual or sexist in nature" this prong is automatically satisfied.

See id. at 605; see e.g., Woods-Pirozzi, 290 N.J.Super at 270 (comments about "getting lucky",

"douche", and "PMS" facially sex-related).  "Sexually derogatory language" is recognized as

gender-based harassment as a matter of course.  See Hargrave, 262 F.Supp.2d at 414 (citing

Andrews v. City of Phila., 895 F.2d 1469, 1482 n. 3 (3d Cir. 1990)).  But if incidents are "not

obviously based on victim's sex" the victim must make prima facie showing that harassment was

because of the victim's sex. See  Lehmann, 132 N.J. at 605 (citing Muench, 255 N.J.Super. 288,

605 A.2d 242 (holding non-sexual harassment constituted sexual discrimination)).  A plaintiff

might meet this burden by showing that facially non-sexual conduct was accompanied by

harassment that was obviously sex-based,  See id. at 605; see e.g.,  Woods-Pirozzi, 290

N.J.Super at 270 (reasonable jury could conclude that throwing a softball near victim's head was

sexual harassment when viewed in light of other sexual comments), or by demonstrating that

only women suffered such harassment.  See Lehmann, 132 N.J. at 605, see e.g., Shope v. Board

of Supervisors, 1993 U.S. App. LEXIS 33058 (4th Cir. 1993) (evidence that other women

suffered discrimination and that defendant did not have similar problems with men supported

finding of hostile work environment).

FOR PUBLICATION

If Allen had harassed everyone equally without regard to gender, Ivan's hostile work environment claim would fail.  See Lehmann, 132 N.J. at 605.  But several of Allen's comments were gender-based.  It is of no import that some of these offensive or obnoxious comments were made to parties other than Ivan.  Where the conduct is "sexual or sexist in nature" the "but for" prong is automatically satisfied.  See id. at 605; see e.g., Woods-Pirozzi, 290 N.J.Super at 270.

        ii.      *Jazikoff*

Defendants make similar arguments with regard to Jazikoff and, again arguing that the actions of defendants are discrete, isolated events, attempt to treat each of the incidents individually.  The Court views the totality of the circumstances, and considers the cumulative effect of each individual incident, keeping in mind "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." Lehmann at 607 (internal citation omitted). When viewed collectively, it is clear that Jazikoff has offered sufficient evidence to survive summary judgment.

Even if the Court were to accept defendants' position, in essence that three incidents of harassment over the course of a year by the same party are discrete and isolated, the severity of the underlying incidents would be sufficient to satisfy Lehmann.

Jazikoff alleges harassment by Blount, Landis and Pepenella.  While Jazikoff's allegations against Pepenella are the thinnest, all three made overtly gender-based comments or overt sexual acts.  The allegations against Landis include facially sexual comments made directly to Jazikoff, the cookie and mooning incidents.  Even if, as defendants suggest,"mooning" is not a sexual act in certain circumstances, see e.g. Shepherd v. Slater Steels Corp., 168 F.3d 998, 1010

FOR PUBLICATION

(7th Cir. 1999); <u>U.S. v. Choate</u>, 32 M.J. 423, 427 (U.S.C.M.A. 1991); <u>In re Dallas W.</u>, 85 Cal. App. 4th 937 (2d App. Dist. 2000), because the other actions by Landis were facially sexual, a reasonable juror could readily conclude that the mooning had a sexual connotation. The cases cited by defendant in support of its assertion that mooning is not sexual are consistent with this approach. While each case refused to hold that mooning was *per se* sexual, the court in each case looked to the context in which the act was done. As the <u>Shepherd</u> court noted, "[w]hether the sexual content of the harassment is indicative of sex discrimination must [] be examined with attention to the context in which the harassment occurs." <u>Shepherd</u> at 1010-11.

The allegations against Blount include telling Jazikoff, in the course of demonstrating how to clean a weapon, that she had to "jerk it off"; comments about Jazikoff's appearance, the Magazine Incident and a Department custom, perpetuated by Blount, of designating the officer without a partner the "house bitch". Defendants argue that these allegations are insufficient to support her LAD claim because they are not sexual in nature. A reasonable juror could readily conclude that the comment about the weapon was sexual in nature when considered in the context of Blount's other facially sexual comments. Similarly, although defendants argue that the Magazine Incident was not severe, when viewed with the other comments made to Jazikoff, by both Blount and others, a reasonable juror could conclude that the comments were severe enough to satisfy <u>Lehmann</u>. This is especially true because Blount was Jazikoff's superior. <u>See Taylor</u>, 152 N.J. at 691-92; <u>see also Flizack</u>, 346 N.J.Super. at 160; <u>Leonard</u>, 318 N.J.Super. 337, 345, 723 A.2d 1007 (App. Div. 1999).

Defendants argue that gender-neutral insults, like "house bitch" do not satisfy the "but for standard" and that, because the custom was not directed at Jazikoff, it is not the proper subject of

FOR PUBLICATION

an LAD claim.  Comments need not be directed toward plaintiff in order to support an LAD

claim.  It is enough that Jazikoff heard the comments.  Lehmann, 132 N.J. at 611.  An LAD

hostile work environment claim may properly rely on evidence that other women were sexually

harassed.  Id.  It follows that, if the "house bitch" custom constitutes harassment, it could form

the basis of Jazikoff's claim whether or not the comment was directed at her specifically.

Not all words that have some sexual connotation constitute discrimination because of sex.

Courts have held that the word "bitch" is not necessarily sexual in nature.  See e.g., Reyes v.

McDonald Pontiac-GMC Truck, Inc., 997 F. Supp. 614, 617-18 (1998) (holding that, although

defendant referred to plaintiff as "miss f****** Queen Bee" and "bitch", such comments were

not because of plaintiff's gender); Hedberg v. Rockford Stop-N-Go, 202 F.3d 273, 1999 U.S.

App. LEXIS 32026, *6 (7th Cir. 1999) ("white bitch" not necessarily motivated by plaintiff's sex

because there is no automatic inference of sexual discrimination solely from the word "bitch").

"It is true that "bitch" is rarely used of heterosexual males . . .  but it does not necessarily connote

some specific female characteristic, whether true, false, or stereotypical; it does not draw

attention to the woman's sexual or maternal characteristics or to other respects in which women

might be thought to be inferior to men in the workplace, or unworthy of equal dignity and

respect. In its normal usage, it is simply a pejorative term for "woman." Reyes at 618 (quoting

Galloway v. General Motors Service Parts Operations, 78 F.3d 1164, 1168 (7th Cir. 1996)) In

contrast, comments that are focused on gender will meet the Lehmann standard.  Shope v. Board

of Supervisors, 1993 U.S. App. LEXIS 33058, *4-5 (4th Cir. 1993) (comments like "shouldn't be

such a soft woman", "too aggressive a woman", "stupid woman", "if you're a weak woman and

FOR PUBLICATION

you've got mental problems, then you just let somebody else come in here and do this job" are

sufficient to support sexual harassment claim).

Contrasting <u>Reyes</u> with <u>Shope</u> reveals that the focus should be on whether the comments

are motivated by gender.  The <u>Hedberg</u> court based its conclusion in large part on this question.

<u>See</u> <u>Hedberg</u> at *6.  In this case, it does not seem that the custom was necessarily discriminatory.

"House bitch" was used to refer to whichever officer was without a partner, without regard to the

gender of that officer.  However, simply because a derogatory term relating to gender is applied

to both genders equally does not mean that the use of the term is not derogatory to one gender.

However, plaintiffs have failed to introduce any evidence that the term as used in the Department

was meant to be derogatory.  The Court concludes that the Department custom of designating a

"house bitch" was not motivated by gender and could not alone form the basis of Jazikoff's

claim.  Even without such custom, plaintiffs have alleged conduct that is sufficiently severe to

support Jazikoff's cliam.

Defendants argue that the Magazine Incident would not be hostile to a reasonable woman.

The third prong of <u>Lehmann</u> imposes an objective reasonableness standard.  <u>Lehmann</u> at 611-12.

The <u>Lehmann</u> court identified several justifications for adopting an objective standard that

inform the Court's inquiry in the present case.  First, the LAD is not a tort statute but is "aimed at

eradicating discriminatory conduct." <u>Lehmann</u> at 612.  Second, an objective standard provides

flexibility as community standards evolve.  <u>See</u> <u>Lehmann</u> at 612.  In this context, the <u>Lehmann</u>

court noted that this does not mean that the reasonableness standard can be used to hold that a

"prevailing level of discrimination is per se reasonable."  <u>Lehmann</u> at 612.  Finally, the purpose

of LAD is "to eliminate real discrimination and harassment."  <u>Lehmann</u> at 612.  Allegations of an

**FOR PUBLICATION**

idiosyncratic plaintiff do not state a claim because such claims would not address real

discrimination.  Lehmann at 613.

      In evaluating reasonableness, the court should take into account that comments may be

just a joke,  See Taylor, 152 N.J. at 615, but should not apply the standard of a reasonable man.

See Woods-Pirozzi, 290 N.J.Super. At 267.  Although the Magazine Incident may have been

intended as a joke, a jury could conclude that a reasonable woman would find it hostile to be

analogized to scantily clad women in a men's magazine by several male co-workers in deciding

which one they might "pick" as a sexual partner.  This is particularly true in light of the other

incidents alleged.

      In contrast to the incidents alleged with regard to Landis and Blount, the record is thin for

Pepenella and the incidents alleged are not particularly severe.  Plaintiffs assert that Pepenella

made "unwanted romantic overtures" to Jazikoff.  Plaintiffs also allege that Pepenella made an

isolated reference to oral sex.  Plaintiff is not entitled to a workplace free of annoyances.  See

Lynch at 452.  Pepenella's mistaken impressions and unwanted overtures, particularly when

contrasted with the behavior of other members of the Department, are not severe or pervasive

enough to support a claim under the LAD on their own.  However, because there is no co-

employee liability under the LAD, Pepenella's liability alone is not the issue. While, standing

alone, plaintiffs' allegations against Pepenella might not sustain a claim under the LAD, in

connection with the allegations against Landis and Blount, they are proper grounds for recovery

against the County or Department.

      Finally, defendants argue that the actions of Spicuzzo and Falcone do not support an

actionable claim because Ivan made no claims of any specific acts as to Spicuzzo or Falcone.

FOR PUBLICATION

The Court notes that, while plaintiffs did not allege any specific acts of harassment by Spicuzzo or Falcone, they did allege acts that may have contributed to a hostile work environment claim. Falcone commented in response to Jazikoff's complaint that Spicuzzo was very upset with her and added "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us?  You think you might have a case?  Try it, go for it.  You will never ever win.  No jury would ever find me or my department guilty of this female bullshit." (Nulty Cert., Ex. K at ¶ 11.)  Spicuzzo as well appears to have failed to respond properly to complaints of harassment.  According to Falcone, Spicuzzo decided not to take any action against Allen, despite a recommendation of discipline.  (Nulty Cert., Ex. JJ at 349:25-350:9).  In any event, it is irrelevant to plaintiffs claims against the County and Department whether they allege specific acts of discrimination by Spicuzzo or Falcone.  As concluded, any claims against Spicuzzo or Falcone under Counts One and Two must be dismissed but Spicuzzo or Falcone may still be liable to the extent they aided and abetted violations of the LAD.[5]  The present issue, however, is whether the actions of Spicuzzo and/or Falcone can support a hostile work environment claim against the Department and/or County.

Defendants do argue that the first two statements do not establish a hostile work environment because they are not objectionable or threatening and that the third statement fails the "but for" standard.  The Court does not agree.  While Falcone's statement that Spicuzzo is upset with Jazikoff because of the complaint might be viewed as unobjectionable, a reasonable juror could also conclude that the statement was meant to express disapproval of complaints of sexual harassment at the highest levels of the Department.  The severity of Falcone's statement is

---

[5]This claim is discussed below.

FOR PUBLICATION

exacerbated because he was a supervisor and suggests that upper-level management was

displeased with Jazikoff for complaining.  See Taylor, 152 N.J. at 691-92.  The second and third

statements are facially gender-related and, therefore, a presumption that they would not have

been made but for Jazikoff's gender applies.  See Reyes, 997 F.Supp. 614; Hedberg, 202 F.3d

273; Boyce, 963 F.Supp. 290; Shope, 14 F.3d 596.  The Court concludes that the actions of

Falcone and Spicuzzo could support a hostile work environment claim against the County and/or

the Department.

More generally, defendants claim that plaintiffs' allegations would extend the scope of

the LAD to become a "general civility code."  (Def.'s Reply at 3 (citing Heitzman at 147.)

According to defendants, allegations concerning "harassment and pervasively sexist attitudes"

which the plaintiffs did not witness or of which they were not aware should not preclude

summary judgment.  (Defs.' Reply at 4 (citing Morales-Evans at 588-90; Sprint/United Mgmt.

Co. v. Mendelsohn, 128 S. Ct. 1140, 1145, 170 L. Ed. 2d 1 (2008).)  Defendants are most

troubled by plaintiffs' introduction of statements by officers Alteria and Netta regarding Allen's

conduct and references to allegations by sheriff's officer Hamilton made in another lawsuit.

Plaintiffs are not legally entitled to an ideal workplace, "free of annoyances and

colleagues [plaintiffs] find[] disagreeable."  Lynch at 452.  However, plaintiffs allegations are not

limited only to uncivil comments or comments made outside the presence of plaintiffs.  Plaintiffs

have alleged several specific instances of sexual and gender-based comments made either

directly to plaintiffs or in the presence of plaintiffs.  Denying summary judgment in these

circumstances will not extend the scope of the LAD but, rather, properly allow a jury to

**FOR PUBLICATION**

determine if these comments are severe and pervasive enough to constitute a hostile work environment.

In summary, defendants motion for summary judgment on Counts One and Two with regard to individual defendants Allen, Blount, Falcone, Spicuzzo, Landis and Pepenella is granted. Defendants' motion for summary judgment with regard to Counts One and Two against the County and Department is denied.

3.      *Counts Three & Four: Vicarious Liability*

At Counts Three and Four plaintiffs claim the County and/or Department are liable for compensatory and punitive damages. Defendants argue that the Court should grant summary judgment on Counts Three and Four because plaintiffs knowingly and willfully failed to comply with their duty to report incidents of sexual harassment and/or discrimination and, when complaints were filed, the Department acted immediately to investigate. Plaintiffs response is two-fold. First, plaintiffs argue that defendants were negligent in that the Department failed to take effective remedial measures in response to complaints. Second, plaintiffs claim that the County and/or Department are liable because Blount and Allen were aided in their harassment by the Department's grant of power to control the day-to-day working environment of plaintiffs.

a.      *Standard*

Employers are strictly liable for equitable remedies and relief arising from hostile work environment claims. Lehmann at 617. Agency principles apply to the determination of whether an employer is liable for compensatory and/or punitive damages. Lehmann at 619. To hold her employer vicariously liable a plaintiff must prove an objectionable act or action was done by a supervisor acting as such employer's agent. See id..

FOR PUBLICATION

Under the Restatement (Second) of Agency (1958) § 219(1), the "master is subject to liability for the torts of his servants committed while acting in the scope of their employment." A "master is not subject to liability for the torts of his servants acting outside the scope of their employment *unless*:" (1) the master intended the conduct or consequences; (2) the master was negligent or reckless; (3) the conduct violated a non-delegable duty; or (4) the agent acted with apparent authority, i.e. the "[s]ervant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Id (quoting Lehmann at 619).[6]

The upshot of these principles is, where a supervisory employee acts within the scope of employment, the employer is liable for compensatory damages and may be liable for punitive damages.  See Lehmann at 619-20. Where allegedly discriminatory acts are taken by supervisors outside the scope of employment or by non-supervisors the employer is not liable for compensatory or punitive damages except in limited circumstances.  See Heitzman v. Monmouth County, 321 N.J. Super. 133, 146, 728 A.2d 297 (App. Div. 1999).  As example, in Woods-Pirozzi, the employer was not liable where a supervisor acted contrary to an anti-discrimination policy and discriminatory comments were "not made as part of exercise duty."  Woods-Pirozzi at 271.

---

[6]        The Lehmann court relied on the Restatement (Second) of Agency (1958), which has been superceded by the Restatement (Third) of Agency (2006) which was recently relied upon by the New Jersey Supreme Court in NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 366, 901 A.2d 871 (2006); see also Estate of Cordero v. Christ Hosp., 403 N.J. Super. 306, 312, 958 A.2d 101 (App. Div. 2008). The principles in Restatement (Second) § 219 relied upon by the Lehmann court are unchanged in Restatement (Third). See *Restatement (Third) of Agency* (2006) § 7.03-08.

FOR PUBLICATION

Even where a supervisor acted outside the scope of employment, the employer may yet be liable under the exceptions found in Section 219(2).  See Lehmann at 620; Restatement (Second) of Agency § 219(2).  First, an employer can be vicariously liable if, although the employer was not negligent, a position of authority enabled the supervisor to harass plaintiff.  See Woods-Pirozzi at 271-72; Restatement (Second) of Agency § 219(2)(d).  A court should ask the following questions in determining if an employer is liable in this context: (1) did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains; (2) did the supervisor exercise that authority; (3) did the exercise of authority result in a violation of [the LAD]; and (4) did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?  See Lehmann at 620 (citing Bruce Chandler Smith, *When Should an Employer Be Held Liable For the Sexual Harassment by a Supervisor Who Creates a Hostile Work Environment? A Proposed Theory of Liability*, 19 *Ariz.St.L.J.* 285, 321 (1987)).

Second, an employer can be vicariously liable if such employer was negligent in preventing harassment by its employee.  See Restatement (Second) of Agency § 219(2)(b).  Sexual harassment can be foreseeable even where anti-harassment policies exist.  See Lehmann at 621.  A plaintiff could demonstrate negligence via "failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms."  Id.  On the other hand, existence of "effective preventative mechanisms" is some evidence of due care.  Id. at 622.  "Effective" remedial measures are those reasonably calculated to end the harassment, See id. at 623, and include "policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members

**FOR PUBLICATION**

of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally, an unequivocal commitment from the top that is not just in words but backed up by consistent practice." Lehmann at 621-22 (citing Klein at 171)). The presence or absence of complaints is relevant to determination of negligence. Woods-Pirozzi at 272.

Third, an employer can be vicariously liable when a plaintiff shows an employer "had actual knowledge of the harassment and did not promptly and effectively act to stop it." Lehmann at 622. It is much more likely that a plaintiff would succeed under a negligence or recklessness theory by showing constructive knowledge. See e.g. EEOC v. Hacienda Hotel, 881 F.2d 1504, 1516 (9th Cir. 1989) (employer had constructive knowledge of harassment); Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987) (harassment was foreseeable); Robinson v. Jacksonville Shipyards, 760 F. Supp. 1486, 1531 (M.D. Fla. 1991) (employer had constructive knowledge of harassment).

Vicarious liability can also be understood as direct liability. "When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." Lehmann at 623. The "employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." Id. at 623.

"[A] higher level of culpability than mere negligence should be required for punitive damages." Id. at 626. Employers "should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." Id. at 624. Where plaintiff

-39-

FOR PUBLICATION

does not allege any discrimination above her immediate supervisor there is no ground for

punitive damages.  Woods-Pirozzi at 273

      b.    *Analysis*

      Plaintiffs do not seriously argue that any of the alleged acts of harassment occurred within

the scope of employment.  As a general rule, "a supervisor who sexually harasses a subordinate is

not acting within the scope of his employment." See Burlington Indus. v. Ellerth, 524 U.S. 742,

758, 118 S. Ct. 2257 (1998).  The Court concludes that the general rule applies in this case and

that the County or Department can only be liable for compensatory or punitive damages if one of

the four exceptions in the Restatement applies.  The first and third do not.  The first exception

would require a showing that the County or Department intended the discrimination and nothing

in the record supports such a conclusion.  The third exception does not apply because there is no

non-delegable duty at issue.  So the County or Department can only be liable for compensatory or

punitive damages if they were negligent or reckless, or if the position of authority conferred upon

Falcone, Spicuzzo, Blount or Allen by the Department enabled the harassment of plaintiffs.

      Plaintiffs have submitted sufficient evidence to create a genuine issue of material fact as

to whether defendants were negligent or reckless in relation to plaintiffs claims.  The

promulgation of the policy does not necessarily insulate the County or Department from a finding

of negligence.  See Hargrave, 262 F. Supp. 2d at 431; see also Lehmann at 621.  Although

defendants argue that Cavuoti creates a "safe haven" for employers who promulgate an anti-

harassment policy that case involved only punitive damages.  See Cavuoti v. New Jersey Transit

Corp., 161 N.J. 107, 120-21, 735 A.2d 548 (1999).  Plaintiffs here seek both compensatory and

punitive damages.  In any event, Cavuoti did not hold, even solely in the area of punitive

FOR PUBLICATION

damages, that simple promulgation of a policy is sufficient to insulate an employer from vicarious liability.  Cavuoti held only that "the efficacy of an employer's remedial program is highly relevant to both the employee's claim against the employer and the employer's defense to liability."  Id., at 121 (quoting Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 536-37, 691 A.2d 321 (1997)).  "[E]ffective preventative mechanisms" would be some evidence of due care, Lehmann at 622, but plaintiff has asserted facts that call into question the effectiveness and consistency of the Department's enforcement of the policy.  If its enforcement was ineffective, the Department could be found negligent or reckless.  See Lehmann at 621-22 (citing Klein at 171).

        Although plaintiffs did testify that they were aware that they had a duty to report violations under the policy and failed to do so on several occasions, the record also demonstrates that plaintiffs did in fact complain, both formally and informally, about several instances of discrimination and were discouraged from pursuing these claims. (See e.g., Pls.' Opp. 64, Ex C, Ivan 174:17 - 178:15; Pls.' Opp. 64, Ex C, Ivan 233:11 - 233:22; Statement of Facts at 5-6 (with regard to plaintiff Ivan); Statement of Facts at 10 (with regard to plaintiff Jazikoff).)  Any failure by Ivan or Jazikoff to formally report harassment carries less weight because plaintiffs have introduced evidence tending to show that defendants failed to establish meaningful and effective enforcement mechanisms..  See Gaines v. Bellino, 173 N.J. 301, 318, 801 A.2d 322 (2002).  When plaintiffs did complain, the record suggests that the investigations were inadequate.  The investigation of Allen's conduct was not conducted within the prescribed time frame and, despite finding a violation, no punishment was ever imposed.  Investigations of Blount and Pepenella were marred by failures to interview witnesses and purported falsification by Alai of statements

FOR PUBLICATION

made by McDermid.  The lack of effectiveness of this remedial scheme is relevant to determining

if employer was negligent, see Payton, 148 N.J. at 537, and plaintiffs have submitted sufficient

facts for a reasonable jury to conclude that defendants were negligent in enforcing the policy.

      The County or Department could also be liable if Falcone, Spicuzzo, Blount or Allen

were aided in violating the LAD "by the power delegated to [them] or to control the day-to-day

working environment."  Lehmann at 620; see also Cavouti.  Allen had limited authority over Ivan

but the record suggests that the authority that Allen did have aided violations of the LAD on two

occasions: the courthouse bathroom incident and the military birthday party incident.  Similarly,

Blount exercised his authority to order Jazikoff to turn around at roll call and in the gun cleaning

incident.  A reasonable juror could conclude based on these events that the County or

Department should be liable for compensatory damages.

      Punitive damages presents a closer question.  The County or Department can only be

liable for punitive damages if plaintiff submits evidence of "actual participation ... or willful

indifference."  See Lehmann at 626.  In order for the Department or County to be liable for

punitive damages, plaintiffs must allege discrimination committed above their immediate

supervisors.  "[A] higher level of culpability than mere negligence should be required for

punitive damages."  Lehmann at 626.  Employers "should be liable for punitive damages only in

the event of actual participation by upper management or willful indifference." Lehmann at 624.

Allen was not Ivan's direct supervisor although he did have authority over her at times.  Jazikoff

alleges that she was harassed by Blount at the time that Blount was her direct supervisor but

Jazikoff, similarly, fails to allege any acts of harassment committed at higher levels of the

Department or County.

FOR PUBLICATION

Plaintiffs, however, did submit evidence that Spicuzzo refused to impose punishment recommended for Allen despite a recommendation that it be imposed.  While this evidence is relatively thin, plaintiffs have created a genuine issue of material fact as to whether Spicuzzo and other upper management were willfully indifferent to plaintiffs' complaints.  Accordingly, the Court denies defendants' motions for summary judgment on Counts Three and Four.

4.      *Counts Five & Six: Aiding and Abetting*

As noted, supervisors Spicuzzo, Falcone, Blount and Allen could be individually liable for aiding and abetting violations of the LAD.  Defendants argue that none of the defendant supervisors can be liable for aiding and abetting because none intended any of the alleged harassment.  Plaintiffs respond that the Blount and Allen can be liable for aiding and abetting acts of harassment that they committed themselves and Spicuzzo and Falcone can be liable for ignoring acts of harassment committed by others.

a.      *Standard*

The LAD imposes individual liability for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  N.J.S.A. 10:5-12(e).  The New Jersey Supreme Court has confirmed the Third Circuit's prediction that the standard for "aid" and "abet" under the LAD is based on the Restatement (Second) of Torts.  See Tarr v. Ciasulli, 181 N.J. 70, 84, 853 A.2d 921 (2004) (citing Hurley, 174 F.3d at 127); see Restatement (Second) of Torts § 876(b).  For an employee to be liable as an aider and abettor under the LAD, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the

FOR PUBLICATION

assistance; [and] (3) the defendant must knowingly and substantially assist the principal

violation." Tarr at 84 (quoting Hurley at 127).

Whether a defendant has provided "substantial assistance" depends on five factors

detailed in the Restatements' comments: (1) the nature of the act encouraged; (2) the amount of

assistance given by the supervisor; (3) whether the supervisor was present at the time of the

asserted harassment; (4) the supervisor's relations to the others; and (5) the state of mind of the

supervisor. See Restatement (Second) Torts § 876(b), comment d.

The LAD does not impose individual liability upon non-supervisory employees, Tyson

918 F. Supp. at 841, but a supervisor may be liable for aiding and abetting his or her own

conduct.[7] Hurley, 174 F.3d at 126.  To reconcile these two positions, the Third Circuit

concluded:

> "Employees are not liable as aider and abettor merely because they had some role, or
> knowledge or involvement. Rather, the degree of involvement, knowledge and culpability
> required as a basis for liability is heightened by the standard that the Restatement sets
> forth and we adopt. Only those employees who meet this heightened standard will be
> aiders and abettors. It is important that this standard be set above mere knowledge and/or
> implementation, lest a reverse respondeat superior liability could be created under the
> guise of aiding and abetting."

Failla v. City of Passaic, 146 F.3d 149, 159 (3rd Cir. 1998).

It is also helpful to keep in mind that for a defendant to be individually liable for aiding

and abetting, the employer must also be liable under the LAD.  It is not the act of discrimination

---

[7] Hurley explained this "somewhat awkward" theory of liability on the basis of the
supervisor's duty to act against harassment.  Hurley, 174 F.3d at 126 (citing Taylor, 706 A.2d at
691).  Such duty can be violated by deliberate indifference or affirmatively harassing acts.
"When a supervisor flouts this duty he subjects himself and his employer to liability."  Id. at 126
(citing Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 134 A.2d 761 (1957)).

**FOR PUBLICATION**

but rather the failure in the employer's response that an aider and abettor is charged with assisting.

   *b.*  *Analysis*

   Because it is uncontested that officers Pepenella and Landis were not supervisors the Court grants summary judgment on Counts Five and Six with regard to them.  See Tyson, 918 F. Supp. at 841.  Only defendants Spicuzzo, Falcone, Blount and Allen can be liable for aiding and abetting.

   These defendants argue that they are entitled to summary judgment because plaintiffs have failed to allege any affirmative acts by Spicuzzo and Falcone, and that any affirmative acts committed by Blount or Allen were committed outside the scope of employment and that neither Blount nor Allen willfully and knowingly associated himself with any other unlawful acts. Defendants argue further that the record does not contain evidence suggesting that any of the individual defendants were aware of their role in the purported tortious conduct or knowingly and substantially assisted a principal violation.[8]

   *i.*  *Spicuzzo & Falcone*

   Defendants' assertion that there is no evidence that Spicuzzo and Falcone engaged in any affirmative acts of discrimination is not dispositive because inaction that "rises to the level of providing substantial assistance or encouragement" could be the basis of aiding and abetting liability.  Hurley, 174 F.3d at 128 (quoting Failla, 146 F.3d at 158, n.11); see also Tarr at 84.

---

   [8] Defendants also assert that none of the individual defendants "shared a community of discriminatory purpose with an alleged actual perpetrator or that they knew of an alleged principal's discriminatory conduct."  (Defs.' Supp. 33 (quoting Herman v. Coastal Corp., 348 N.J. Super. 1, 27, 791 A.2d 238 (App. Div. 2002).)

FOR PUBLICATION

Plaintiffs claim that Spicuzzo acquiesced to acts of sexual harassment and the creation of a hostile work environment.  Plaintiffs claim that Spicuzzo routinely failed to impose appropriate discipline.  Specifically, Falcone was not punished despite a jury finding, in an unrelated case involving another sheriff's officer, that Falcone had created a hostile work environment; Allen was not disciplined after discipline was recommended by Director Cross; and Spicuzzo tolerated pornographic materials in the workplace.  Plaintiffs argue further that Spicuzzo bears responsibility for the Department's discriminatory policies and procedures.  Finally, plaintiffs argue that Spicuzzo's personal animus for Ivan, as determined by the administrative law judge, establishes how Spicuzzo "poisoned [Ivan's] working environment."

The lack of discipline against Falcone in officer Mazzei's case is irrelevant.  Such failure, even if true, would not tend to show that Spicuzzo responded inadequately to complaints from plaintiffs Ivan or Jazikoff.  It is not enough to simply assert that Spicuzzo is the highest ranking official in the Department.  The Court is mindful of the Third Circuit's admonishment that "[i]t is important that this standard be set above mere knowledge and/or implementation, lest a reverse respondeat superior liability could be created under the guise of aiding and abetting."  While Spicuzzo clearly had a hand in creating the departmental policies, the law requires more to hold Spicuzzo individually liable.  Even without consideration of these facts, plaintiffs have submitted sufficient evidence to survive summary judgment.  More importantly, Spicuzzo, despite receiving clear notice of a violation of the LAD declined to impose punishment on Allen.  Additionally, pornography was often present in the department.  While there is no direct evidence that Spicuzzo knew of the pornography, a jury could reasonably infer that he must have known of its existence.

FOR PUBLICATION

The allegations with regard to Falcone are also sufficient to survive summary judgment. A juror could reasonably infer from Falcone's comments that Spicuzzo did not plan to impose punishment on Ivan that he was "generally aware of his role" as part of the harassment of plaintiffs. Additionally, a reasonable juror could conclude that Falcone knowingly and substantially assisted the violation of the LAD by discouraging complaints. See Tar at 84. Falcone directed the threats both generally at roll call and specifically toward both plaintiffs in response to their complaints of harassment. Falcone told Jazikoff, "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us? You think you might have a case? Try it, go for it. You will never ever win. No jury would ever find me or my department guilty of this female bullshit." (Nulty Cert., Ex. K at ¶ 11.) In answer to complaints from Ivan, Falcone threatened that he would "drum up" charges against her. (Statement of Facts at 46.) Plaintiffs also claim that they were discouraged from filing complaints for fear of reprisals.

     *ii.*    *Blount & Allen*

Plaintiffs rest their aiding and abetting claims against Blount and Allen primarily on the affirmative acts of harassment alleged against each defendant. Defendants argue that any affirmative acts committed by Blount or Allen were committed outside the scope of employment and that neither willfully and knowingly associated himself with any other unlawful acts. Having held that the actions of both Blount and Allen could be the basis of liability for the County or Department, the Court need not address here whether their acts were within the scope of employment. Blount or Allen as supervisors can be held liable for aiding and abetting their own

**FOR PUBLICATION**

specific acts of harassment.  See Hurley, 174 F.3d at 126.  Defendants' motion for summary

judgment on Counts Five and Six is denied.

**Counts Eleven through Fifteen: Retaliation under CEPA, LAD and the Petition Clause**

At Counts Eleven through Fifteen, plaintiffs claim that defendants retaliated against

Jazikoff and Ivan in response to both their formal and informal complaints.  Plaintiffs ground

these claims on the LAD, the petition clause of the First Amendment to the United States

Constitution and, with regard only to plaintiff Ivan, the New Jersey Conscientious Employee

Protection Act ("CEPA").  Before turning to the merits of these retaliation claims, the Court must

resolve several procedural issues relating to Ivan's claims.  First, defendants argue that by

instituting a CEPA claim, Ivan has waived her other retaliation claims.  Second, defendants argue

that Ivan's CEPA claim is barred by the statute of limitations.

5.      *Waiver of claims under CEPA*

a.      *Standard*

Filing of a claim under CEPA acts as a waiver of other retaliation claims.  The relevant

statutory text reads:

> "Nothing in this act shall be deemed to diminish the rights, privileges, or
> remedies of any employee under any other federal or State law or regulation or
> under any collective bargaining agreement or employment contract; except that
> the institution of an action in accordance with this act shall be deemed a waiver of
> the rights and remedies available under any other contract, collective bargaining
> agreement, State law, rule or regulation or under the common law."

N.J. Stat. Ann. § 34:19-8 (2008).

As the New Jersey Supreme Court has observed, the scope of the waiver provision is

unclear from this text alone.  See Young v. Schering Corp., 141 N.J. 16, 24-25, 660 A.2d 1153 (

1995).  In any event, CEPA was enacted to protect whistle-blowers from retaliatory action, see

FOR PUBLICATION

id. at 23, and the scope is accordingly limited to claims for retaliatory discharge.  See Flaherty v.

Enclave, 255 N.J. Super. 407, 413-14, 605 A.2d 301  (Law Div. 1992) (claims for pre-

termination compensation not waived by filing of CEPA claim).  "The causes of action that fall

within this waiver provision are those causes of action that are directly related to the employee's

termination due to disclosure of the employer's wrongdoing."  Falco v. Community Medical

Center, 296 N.J. Super. 298, 318, 686 A.2d 1212 (App. Div. 1997) overruled on other grounds

by Dzwonar v. McDevitt, 177 N.J. 451, 463, 828 A.2d 893 (2003) (quoting Young v. Schering

Corp., 275 N.J. Super. 221, 238, 645 A.2d 1238 (App. Div. 1994), aff'd 141 N.J. 16, 660 A.2d

1153 (1995) (dismissing claims for retaliatory discharge, constitutional tort, negligent infliction

of emotional stress, intentional infliction of emotional stress, and discharge in violation of public

policy as waived by plaintiff's assertion of a CEPA claim).

On the other hand, causes of action that are "substantially independent"from the CEPA

claims are not waived by institution of a CEPA action.  See Young, 141 N.J. at 29, 33.  The

question is whether the other claims require different proofs from those required to sustain a

CEPA claim.  See id. at 30-31.  If a claim once proven would not be a violation of CEPA, such

claim would not be waived by assertion of a CEPA claim.  See Casper v. Paine Webber Group,

Inc., 787 F. Supp. 1480, 1509 (D.N.J. 1992).

Several courts in this district have applied this standard to conclude that certain claims

were waived, as have several New Jersey courts.  See, e.g., Lynch v. New Deal Delivery Service,

Inc., 974 F. Supp. 441, 456 (D.N.J. 1997) (by instituting CEPA claim, plaintiff waived retaliatory

discharge based on intentional infliction of emotional stress claims); Cokus v. Bristol Myers

Squibb Co., 362 N.J. Super. 366, 390-91, 827 A.2d 1173 (Law Div. 2002) aff'd , 362 N.J. Super.

FOR PUBLICATION

245, 827 A.2d 1098 (App. Div. 2003) (claims waived because facts underlying both CEPA claim and emotional distress claim were the same); Falco, 296 N.J. Super. at 325-26 (court properly denied motion to amend complaint based on CEPA's waiver provisions).  Courts have also found that claims based on factual scenarios that might support a CEPA claim are not waived if they require different proofs.  See, e.g., Kadetsky v. Egg Harbor Township Board of Education, 82 F. Supp. 2d 327, 342 (D.N.J. 2000) (citing Young, 141 N.J. at 32) (defamation claim not waived because defamation, although it might involve factual scenarios that might form the basis of a retaliation claim, requires different proofs from CEPA claim) (internal citations omitted).

Not every LAD claim is waived by assertion of a CEPA claim, just those that would require a finding that would be actionable under CEPA.  Cf. Bowen v. Parking Authority of the City of Camden, No. 00-5765 (JBS), 2003 WL22145814, *24 (D.N.J. Sept. 13, 2003) at 24 (citing Young, 141 N.J. at 29).  But retaliation claims under the LAD necessarily fall within the CEPA waiver provision.  Bowen (citing Sandom v. Travelers Mtg. Servs., Inc ., 752 F.Supp. 1240, 1244 (D.N.J. 1990)).

    b.    Analysis

The Court notes as an initial matter that Ivan failed to address defendants' waiver argument in their briefing.  In any event, applying the standard, defendants are entitled to summary judgment on Ivan's retaliation claims in Counts Seven and Eleven unless they are "substantially independent" from her CEPA claims.  Young, 141 N.J. at 33.  These claims can avoid waiver if they require different proofs from those required to sustain a CEPA claim.  See Young, 141 N.J. at 30-31.

FOR PUBLICATION

With respect to their LAD retaliation claim, Ivan cannot make this showing.  In Count

Seven, Ivan alleges that she suffered retaliation by complaining about incidents of sexual

harassment in violation of the LAD. ( Compl. ¶¶ 190-96.)  "It is beyond dispute that the

framework for proving a CEPA claim follows that of a LAD claim."  Donofry v. Autotote

Systems, Inc., 350 N.J. Super. 260, 290, 795 A.2d 260 (App. Div. 2001) (citing Abbamont v.

Piscataway Township Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994); Kolb v. Burns, 320

N.J. Super. 467, 477, 727 A.2d 525 (App. Div. 1999)). CEPA requires proof of four elements:

(1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2)

that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse

employment action has been taken against him or her; and (4) that the whistle-blowing activity

caused such adverse employment action. See Kolb, 320 N.J. Super. at 476; see also Dzwonar,

177 N.J. at 462.  The latter three of these are the elements a plaintiff must prove to prevail on the

LAD retaliation claim.   Bowen, 2003 WL22145814, *24 .

Similarly, Ivan's petition clause claims, if proved, would form the basis of a CEPA claim.

See, e.g., Falco , 296 N.J. Super. at 304, 318 (affirming trial court determination that claim for

constitutional tort was waived by electing CEPA claim).  There is no clear case law, however, as

to whether CEPA waiver provisions reach federal retaliation claims as well.  Because defendants

concede that the CEPA waiver provision does not apply to plaintiffs' federal claims, (Defs.'

Supp. (Dkt. Entry No. 138) 7 n.1.)), the Court declines to reach this question and assumes that

Ivan's petition clause claims can proceed.

Defendants' motion for summary judgment is granted with respect to Count Seven and

denied as to Count Eleven.

**FOR PUBLICATION**

6.      *CEPA Statute of Limitations*

Defendants argue that Ivan's CEPA claim is barred by the statute of limitations because the only act attributable to Spicuzzo occurred on December 16, 2002 and Ivan did not add her CEPA claim to the present matter until January 8, 2004.  (Defs.' Opp. 5-6.)  Plaintiffs argue that Ivan's CEPA claim is timely because the statute of limitations starts not from the date Spicuzzo witnessed the alleged smoking, or even when Spicuzzo issued the Preliminary Notice of Disciplinary Action but from the date of Ivan's suspension on May 12, 2003.

a.      *Standard*

The statute of limitations for CEPA claims is one year.  See N.J. Stat. Ann. § 34:19-5 (2000); see also Green v. Jersey City Bd. of Educ., 177 N.J. 434, 446, 828 A.2d 883 (2003).  The CEPA claim accrues on the date of the adverse employment action.  See Jones v. Jersey City Med. Ctr., 20 F. Supp. 2d 770, 772 (D.N.J. 1998).  CEPA prohibits retaliatory action in response to whistle-blowing.  See N.J. Stat. Ann. § 34:19-3 (2000).  "The definition of retaliatory action speaks in terms of completed action.  Discharge, suspension or demotion are final acts.  'Retaliatory action' does not encompass action taken to effectuate the 'discharge, suspension or demotion.'"  Daniels v. Mut. Life Ins. Co., 340 N.J. Super. 11, 16, 773 A.2d 718  (App. Div. 2001) (quoting Keelan v. Bell Communications Research, 289 N.J. Super. 531, 539, 674 A.2d 603 (App. Div. 1996)).

b.      *Analysis*

Ivan's cause of action accrued on the date of the "adverse employment action."  With regard to the Smoking Incident, this occurred on May 12, 2003 when she was suspended.  So, her claim, having been filed on January 8, 2004, was timely.  Here, as in Keelan, "[c]ommencing the

FOR PUBLICATION

statute of limitations at an earlier date [would] contravene[] the concept that CEPA is remedial legislation that should be liberally construed." Keelan, 289 N.J. Super at 540. Ivan's CEPA claim is not time-barred.

7.     *LAD retaliation, CEPA and the petition clause*

In summary, by asserting her CEPA claim Ivan waived her LAD retaliation claims but did not waive her petition clause claim.  In addition, Ivan's CEPA claim is not time barred.  The Court now considers the parties' respective motions for summary judgment on plaintiffs' remaining retaliation claims: Ivan's CEPA claim, Jazikoff's LAD retaliation claim and the petition clause claims of both plaintiffs.  Because the LAD, CEPA and the petition clause share similar retaliation standards and often case law, it is helpful to discuss the standards together.

a.     *CEPA*

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging" in such activity.  Abbamont, 138 N.J. 405, 431, 650 A.2d 958 (1994); see also Barrat v. Cushman & Wakefield, 144 N.J. 120, 127, 675 A.2d 1094 (1996); Higgins v. Pascack Valley Hospital, 158 N.J. 404, 417, 730 A.2d 327 (1999).  CEPA should be construed liberally to achieve this purpose.  See Estate of Roach v. TRW, Inc., 164 N.J. 598, 610, 754 A.2d 544 (2000).

Under CEPA, "[a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:

a.     Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes (1) is in violation of a law, or a rule or regulation promulgated pursuant to law... (2) is fraudulent or criminal[;]...

FOR PUBLICATION

b.      Provides information to, or testifies before, any public body conducting an investigation hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer[;]... or

c.      Objects to or refuses to participate in any activity, policy or practice which the employee reasonably believes:

    (1)     is in violation of a law, or a rule or regulation promulgated pursuant to law [;]...

    (2)     is fraudulent or criminal; or

    (3)     is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."

N.J. Stat. Ann. § 34:19-3.

To succeed in a CEPA claim a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action.  See Kolb, 320 N.J. Super. at 476; Dzwonar, 177 N.J. at 462.

At base, CEPA covers employee complaints about activities the employee reasonably believes are (i) in violation of specific statute or regulation; (ii) fraudulent or criminal; or (iii) incompatible with policies concerning public health, safety or welfare or the protection of the environment.  See Estate of Roach, 164 N.J. at 610.

*b.*     *LAD Retaliation*

The LAD prohibits

"reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the LAD] or to coerce, intimidate, threaten or interfere with any person in the exercise of enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the LAD]."

N.J. Stat. Ann. § 10:5-12(d).

FOR PUBLICATION

A successful plaintiff must show: (1) the employee engaged in a protected activity known to the defendant; (2) the employee was thereafter subjected to an adverse employment decision; and (3) there was a causal link between the two.  See Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 548, 665 A.2d 1139 (1995) (internal citations omitted).  Once a plaintiff establishes these prima facie elements, a defendant must articulate a legitimate non-discriminatory reason for the decision.  See id.  The plaintiff must then come forward with evidence that this reason was merely a pretext for the underlying discriminatory motive.  See id.

    c.    *Petition Clause*

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Where retaliation is in response to expressive conduct that is speech, a governmental employee has no first amendment immunity from retaliation unless that matter is of public concern.  See San Filippo, Jr. v. Bongiovanni, 30 F.3d. 424, 434 (3d Cir. 1994) (citing Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983)).  Where the expressive conduct includes filing of a lawsuit or grievance, the petition clause is implicated and such lawsuit need not relate to a matter of public concern.  See id. at 442-43.  As long as a lawsuit is not a sham, it is not a constitutionally permissible grounds for dismissal.  See id. at 443.

For a prima facie case under the petition clause, a plaintiff must show: "(1) that [plaintiff] engaged in a protected activity under [the] First Amendment[;] (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights[;] and (3) that there was a causal connection between the protected activity and the retaliatory

FOR PUBLICATION

action." Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007). Plaintiff

bears the initial burden to demonstrate that the constitutionally protected conduct was "a

substantial or motivating factor" in the retaliatory conduct. See Rauser v. Ward, 241 F.3d 330,

333 (2001). The defendant then bears the burden of proving by a preponderance of the evidence

it would have taken the same action absent the protected activity. See id.

8.    Analysis

    a.    Retaliation

    Defendants do not seriously contend that plaintiffs have failed to satisfy the first prong for

purposes of each of the three retaliation laws. Whistle-blowing includes disclosure of improper

acts or omissions "... to a supervisor or a public body ..." N.J. Stat. Ann. § 13:19(a) et seq.). As

to Jazikoff's LAD claim, filing a charge with the EEOC is clearly protected activity under the

LAD. See Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 275, 675 A.2d 684 (1996).

While filing a facially invalid complaint would not constitute "participation," and therefore

would not be protected activity under the LAD, plaintiff need only allege a violation of the LAD

in his or her complaint in order for the complaint to constitute protected activity. Cf. Slagle v.

County of Clarion, 435 F.3d 262, 268 (3d Cir. 2006) (upholding grant of summary judgment on

Title VII retaliation claim where plaintiff made an EEOC charge only for "unspecified civil rights

violations").[9] This is true regardless of whether the charges were valid or reasonable. See id.

Here, because Jazikoff alleged violations of the LAD in her internal complaints, in her EEOC

------

    [9] Slagle involved a retaliation claim under Ttile VII. Analysis of Title VII is equally
applicable to the LAD. Cortes v. Univ. of Med. & Dentistry of N.J., 391 F. Supp. 2d 298, 311
(D.N.J. 2005) (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1212 (3d Cir. 1995)).

FOR PUBLICATION

charge and the complaint in this action, Jazikoff has satisfied this prong for purposes of her LAD

retaliation claim.

Likewise, there is no question that Ivan has satisfied the first prong for purposes of her

CEPA claim.  Ivan's protected activities include writing reports to the Office of Affirmative

Action on April 25, 2001 and May 3, 2001, making the EEOC charge and instituting this action.

These activities are clearly protected "whistle-blowing" activities under CEPA.  Under CEPA,

Ivan need not show there was an actual violation of law, just that the plaintiff held a reasonable

belief that one of the three categories of activities was occurring.  See Estate of Roach, 164 N.J.

at 613.  While the record lacks direct evidence that Ivan reasonably believed that the behavior she

complained of violated a law or regulation, the Court has little trouble determining that a

reasonable juror could decide from the circumstances that Ivan had such a reasonable belief.

The same si true for both plaintiff's petition clause claims. To succeed under the petition

clause a plaintiff must prove that the conduct which led to the alleged retaliation was

constitutionally protected.  Rauser, 241 F.3d at 333 (citing Thaddeus-X v. Blatter, 175 F.3d 378,

389 (6th Cir. 1999) (en banc); Drexel v. Vaughn, No. 96-3918, 1998 WL 151798, *7 (E.D. Pa.

April 2, 1998)).  Defendants do not dispute that plaintiffs' EEOC charges and federal complaints

are constitutionally protected petitions.  In any event, these complaints are protected activity so

long as they are not shams.  See San Filippo, 30 F.3d. at 443.  Because there is no evidence that

any of the complaints are shams, both plaintiffs have satisfied this prong for their petition clause

claims.

Each plaintiff must still meet the two latter prongs of each cause of action by introducing

evidence of both retaliatory conduct and causation. Because the facts underpinning each

FOR PUBLICATION

plaintiff's claims differ, as do the legal standards for the latter two prongs among these three

causes of action, the Court will now discuss the claims of each plaintiff in turn.

        *b.*      *Jazikoff*

            *i.*     *LAD*

The standard for retaliatory conduct under the LAD is not entirely clear.  Jazikoff urges

the Court to apply Burlington Northern & Santa Fe R.R. Co., 548 U.S. 53, 126 S. Ct. 2405

(2006) and require only a showing that adverse actions would dissuade a reasonable employee

from making a complaint.  See 548 U.S. at 67-68.  Burlington Northern involved retaliation

under Title VII and the Court is mindful that analysis of Title VII is often applicable to the LAD.

See n. 8 *supra*.  The Court concludes, however, that the Burlington Northern standard does not

apply to the LAD retaliation provisions.  Under the LAD a plaintiff must do more than show that

adverse actions would dissuade a reasonable employee from making a complaint: a plaintiff must

allege she has suffered an "adverse employment action."

The Court reaches this conclusion because the language of Title VII differs from the LAD

as interpreted by New Jersey courts.  Title VII prohibits "discriminating" against any employee

who opposes unlawful employment practices.  See 42 U.S.C. § 2000e-3(a).  In Burlington

Northern, the Supreme Court held that this language only required plaintiffs to show that the

purported retaliatory action would dissuade a reasonable employee from making a complaint.

The LAD makes it illegal to take "reprisals" against any person who opposes or who files

complaints against employment practices in violation of the LAD.  N.J. Stat .Ann. § 10:5-12(d).

In contrast to the Burlington Northern standard, New Jersey courts have read the LAD to require

plaintiffs alleging retaliation to show an "adverse employment action."  See El-Sioufi v. St.

FOR PUBLICATION

Peter's Univ. Hosp., 382 N.J. Super. 145, 176, 887 A.2d 1170 (App. Div. 2005) .  Under the

LAD, an "adverse employment action" is one "sufficiently severe or pervasive to have altered

plaintiff's conditions of employment in an important and material manner."  Id. (citing Cokus at

246) (discussing analogous standard for retaliatory action under CEPA).  The Court is further

convinced that Burlington Northern does not disturb the requirement that LAD plaintiffs prove

that they suffered an "adverse employment action" because the New Jersey Appellate Division

noted that Burlington Northern adopted a "reasonable employee" standard for purposes of Title

VII retaliation while at the same time holding that LAD retaliation must "affect adversely the

terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the

plaintiff in a way which would tend to deprive her of employment opportunities or otherwise

affect her status as an employee."  See Schott v. State of New Jersey, 2006 WL 1911375, *9 n. 3

(N.J. Super. App. Div. July 13, 2006) (internal citations omitted).  It may be arguable that the

LAD shares the statutory characteristics that led the Supreme Court to conclude that a lower bar

applied to Title VII retaliation plaintiffs.  New Jersey courts, however, have held that the LAD

requires an "adverse employment action" and the Court will apply this standard to plaintiffs'

LAD retaliation claims.

   Turning to the merits, courts have looked to CEPA for guidance on what constitutes an

"adverse employment action."  See El-Sioufi, 382 N.J. Super at 176.  Under CEPA, "[t]he

definition of retaliatory action speaks in terms of completed action.  Discharge, suspension or

demotion are final acts."  Daniels, 340 N.J. Super. at 16 (quoting Keelan, 289 N.J. Super. at 539).

When a plaintiff does not allege a discharge, suspension or demotion, "conduct must be serious

and tangible enough to materially alter the employee's terms and conditions of employment or

-59-

FOR PUBLICATION

adversely affect her status as an employee." Cortes v. Univ. of Med. & Dentistry of N.J., 391 F.

Supp. 2d 298, 312 (D.N.J. 2005) (citing Calloway v. E.I. DuPont de Nemours & Co., No. 98-

669, 2000 WL 1251909, *8, 2000 U.S. Dist. LEXIS 12642 (D. Del. Aug. 8, 2000)).

Generally, harassment alone is not enough.  Cortes, 391 F. Supp. 2d at 312 (citing

Shepherd v. Hunterdon Develop. Ctr., 336 N.J. Super. 395, 419, 765 A.2d 217 (App. Div. 2001)

rev'd in part, 174 N.J. 1, 803 A.2d 611 (2002)).  The Cortes court concluded that a plaintiff EMT

who alleged various acts of harassment by coworkers, including tampering with her work

equipment and expressing desires not to work with her had failed to show an adverse

employment action because none of the acts was serious and tangible and none was capable of

inflicting direct economic harm.  Cortes, 291 F. Supp. 2d at 313.  Harassment can make a claim

of retaliation more credible but an adverse employment action requires something more.  See

Shepherd, 336 N.J. Super. at 419 (citing Hurley v. Atlantic City Police Dep't, 933 F. Supp. 396

(D.N.J. 1996), aff'd 174 F.3d 95 (3d Cir. 1999) (claim could proceed because plaintiff was

transferred to an undesirable post and was denied a pay raise)).  Harassment could form the basis

of retaliation claim if it was egregious enough to constitute a constructive adverse employment

action.  As example, if harassment was so intolerable that plaintiff was forced to transfer.  See

Shepherd, 226 N.J. Super. at 419.

Plaintiff need not show that the adverse employment action resulted in financial hardship.

Although defendants argue that a transfer cannot be an adverse employment action unless it

results in a tangible loss, See Schott v. State of New Jersey, 2006 WL 1911375 (N.J. Super. App.

Div. July 13, 2006), that opinion does not clearly support the proposition that any transfer that

does not result in a tangible loss cannot constitute an adverse employment action.  Rather, the

FOR PUBLICATION

Schott court focused on whether, under an objective standard, a transfer was materially adverse.

Schott, 2006 WL 1911375, *9.

Here, Jazikoff alleges myriad actions that an employee would likely find objectionable but none of her allegations, standing on their own, rises to the level of an "adverse employment action." Jazikoff was neither terminated nor suspended. Her allegations of the harassing conduct toward her are not so numerous and severe to permit a factfinder to conclude that she was constructively discharged. Because Jazikoff has failed to submit evidence demonstrating that she suffered retaliatory acts within the meaning of the LAD, the Court need not consider the causation prong of the test and will grant defendants' motion for summary judgment on Count Eight.

> ii.    *Petition Clause*

As an initial matter, defendants, relying on Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 439-40 (D.N.J. 2003), argue that plaintiffs' petition clause claims must be dismissed because retaliation claims are the exclusive province of Title VII. Because plaintiffs rely on the filing of their EEOC charges as protected activity, according to defendants, they assert a right that exists only under Title VII. Defendants' reliance on Hargrave is misplaced. The Hargrave court observed that the cases holding that retaliation claims may only be asserted under Title VII turn "on a finding that the right at issue existed *exclusively* as a creation of Title VII." Hargrave, 262 F. Supp. 2d at 439-40 (quoting Bair v. City of Atlantic City, Nos. 99-5232, 99-5233, 2000 WL 1897391 (D.N.J. June 16, 2000)). The right that plaintiffs assert here is not the right to file an EEOC charge but, rather, the right to petition the government as protected by the First Amendment. That one of plaintiffs' petitions happens to be filed under a Title VII procedure is

**FOR PUBLICATION**

irrelevant.  In any event, both plaintiffs also filed federal complaints and, therefore, the

constitutional retaliation claims survive.

In contrast to the LAD, under the relatively liberal standard for retaliatory conduct under

the petition clause, Jazikoff survives summary judgment.  It is sufficient for purposes of the

petition clause, if retaliatory conduct would "deter a person of ordinary firmness" from

exercising her First Amendment rights.  Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

First Amendment retaliation claims may be available even where the retaliatory conduct is

relatively minor.  "Even an act of retaliation as trivial as failing to hold a birthday party for a

public employee, if intended to punish her for exercising her free speech rights" may be

actionable.  Citizens for a Better Lawnside v. Bryant, No. 05-4286 (RBK), 2007 U.S. Dist.

LEXIS 38514, *14-15 (D.N.J. May 24, 2007) (citing O'Connor v. City of Newark, 440 F.3d 125,

127 (3d Cir. 2006)) (internal quotations omitted).  Whether the behavior has a coercive quality is

also relevant to this inquiry.  See Citizens for a Better Lawnside, 2007 U.S. Dist. LEXIS 38514 at

*15.  The standard is objective.  See id. at * 17.

Based on the myriad instances of harassment and discriminatory application of sick leave

and shift change policies, a reasonable juror could conclude that the treatment of Jazikoff would

deter a person of ordinary firmness from making complaints.

Although the allegations as to causation are somewhat thin, Jazikoff has created a

genuine issue of material fact as to whether the alleged retaliatory acts were in response to her

complaints.  Temporal proximity can be helpful in assessing causation under the petition clause

but it is not dispositive.  When retaliatory action occurs well after protected activity the inference

that protected activity was a substantial factor is more difficult to draw but is not foreclosed.  See

FOR PUBLICATION

San Filippo, 30 F.3d at 444.  When a plaintiff is dismissed shortly after final act of protected

activity a reasonable juror could infer a connection between the two.  See id..  A petition clause

claim gains strength if a plaintiff shows that defendant lacked a pretext.  See id..  The court may

look to a range of circumstantial evidence when considering the causal link.  See Farrell v.

Planters Lifesave Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  This evidence may include timing,

ongoing antagonism,  inconsistent explanations, evidence of retaliatory animus in the intervening

period  See id. (citing relevant case law).  But a finding of causation can be based on "other

evidence gleaned from the record as a whole."  Id. at 281.

Jazikoff has introduced evidence after her complaints were filed, she suffered ongoing

antagonism from her superiors and co-workers.  While temporal proximity alone would not be

enough, the number and nature of the alleged acts of retaliation would allow a reasonable

conclusion that it was motivated by Jazikoff's complaints.   Defendants' motion for summary

judgment as to Count Twelve is denied.

       c.     Ivan

            i.     CEPA

As noted, Ivan has satisfied the first prong of CEPA by demonstrating that she engaged in

protected activity.  Ivan has also submitted sufficient evidence of retaliatory conduct for purposes

of CEPA. Ivan's suspension in connection with the Smoking Incident was clearly an adverse

employment action within the meaning of CEPA.   CEPA defines "retaliatory action" as "the

discharge, suspension or demotion of an employee, or other adverse employment action taken

against an employee in the terms and conditions of employment."  N.J. Stat. Ann. § 34:19-2(e).

However, none of the other purported retaliation qualifies.  Adverse employment actions are

**FOR PUBLICATION**

those final actions which affect plaintiff's compensation or rank.  See Hancock v. Borough of

Oaklyn, 347 N.J. Super. 350, 60, 827 A.2d 1173 (App. Div. 2002) (citing Zamboni v. Stamler,

847 F.2d 73, 82-83 (3d Cir.), cert. denied, 488 U.S. 899 (1988)).  Although actions short of

termination may constitute adverse employment actions, "not everything that makes an employee

unhappy" does.  Cokus, 362 N.J. Super. at 378 (internal citations omitted).  Actions are not

necessarily retaliation solely because "they result in a bruised ego or injured pride on the part of

the employee."  Klein v. Univ. of Med. & Dentistry, 377 N.J. Super. 28, 46, 871 A.2d 681 (App.

Div. 2005).  The purpose of CEPA is prevent retaliatory action not resolve workplace disputes.

Klein at 45.

Accordingly, Ivan's CEPA retaliation claim can only be based on her punishment in

connection with the Smoking Incident[10] and plaintiffs must sustain their burden of introducing

evidence that such punishment was caused by Ivan's complaints.  To evaluate causation, the

Court must first confront plaintiffs' argument that collateral estoppel should apply to the

administrative law judge's determination that such punishment was based on personal animus.

Defendant's argue that application of collateral estoppel is inappropriate for two reasons.  First,

defendants claim that they were not afforded a full opportunity to litigate in the administrative

proceeding.  Second, defendants argue that the Merit System Board (the "MSB"), which upheld

---

[10] Defendants' brief focused exclusively on the determination that Ivan's termination was
proper, asserting that Ivan has failed to satisfy her burden of proving that her firing was in
response to whistle blowing activity.  Specifically, defendants submitted that Ivan was fired
because she failed to qualify with her weapon.  Without addressing defendants' arguments as to
termination, Ivan pointed to retaliation for the Smoking Incident and moved affirmatively for
summary judgment, arguing that the administrative law judge's finding that personal animus was
the motivating factor in Ivan's punishment for the Smoking Incident is entitled to collateral
estoppel treatment.

FOR PUBLICATION

the administrative law judge's determination, did not adopt all of the administrative law judge's

findings and, specifically, did not adopt the administrative law judge's determination as to

retaliatory animus.

The consequences of applying collateral estoppel to the administrative judge's

determination differ with respect to the parties' respective motions for summary judgment.  This

determination and administrative law judge's related determination that Ivan was properly

terminated were procedurally identical.  If the administrative law judge's determination with

regard to the Smoking Incident is entitled to collateral estoppel, collateral estoppel should also

apply to his conclusion that Ivan's termination was proper.[11]  If collateral estoppel attaches the

determination that Ivan's termination was proper, the Court must grant partial summary

judgment to defendants on Ivan's retaliation claims to the extent they are based on the

termination because there would remain no genuine issue of material fact as to whether the

termination could support a CEPA claim.  By operation of collateral estoppel, Ivan's termination

would not have been caused by Ivan's whistle-blowing activities and Ivan could not sustain a

retaliation claim under any of the retaliation laws.  In contrast, even if collateral estoppel attaches

---

[11]As plaintiffs point out, defendants in their Brief in Support of Defendants, County of Middlesex, Middlesex County Sheriff's Department and Sheriff, Middlesex County's Motion for Summary Judgment (the "Corson Brief") make an argument that is in logical opposition to the argument asserted in this context.  Specifically, defendants argue there that Ivan's retaliation claim is barred by the doctrine of res judicata based on the administrative judge's determination that Ivan's firing was due to a failure to qualify on her weapon, asserting that "collateral estoppel applies for administrative hearings for agencies acting in a judicial capacity resolving disputed issues where the party had an opportunity to litigate." (Pl.'s Reply 8 (citing Corson Brief 4-10).) In the Corson Brief defendants argue that because Ivan participated in hearing, presented evidence and was given an opportunity to testify under oath and confront witnesses, collateral estoppel applies.  (Id.)

**FOR PUBLICATION**

with regard to the Smoking Incident, defendant must still demonstrate that there is no genuine

issue of material fact with regard to each CEPA element.

"A party is precluded by collateral estoppel from relitigating matters or facts which the

party actually litigated and which were determined in a prior action, involving a different claim

or cause of action, and which were directly in issue between the parties." Zoneraich v. Overlook

Hosp., 212 N.J. Super. 83, 93, 514 A.2d 53 (App. Div. 1986) cert. denied 107 N.J. 32, 526 A.2d

126 (1986). Adjudicative determinations by administrative tribunals are entitled to preclusive

effect if rendered in proceedings meriting that deference.  It is no objection that the

administrative decision was subjected only to a lenient standard of review."  Id. at 94 (internal

citations omitted).

The New Jersey Supreme Court has held that in order to apply collateral estoppel a

previous determination must meet the following criteria: (i) the issue is identical to the issue

decided in earlier proceeding; (ii) the issue was actually litigated in a earlier proceeding; (iii) the

court issued a final judgment on the merits; (iv) the determination was essential to the earlier

judgment; and (v) the party against whom the doctrine is asserted was a party to or in privity with

a party to the earlier proceeding.  See In re Estate of Dawson, 136 N.J. 1, 20-21, 641 A.2d 1026

(1994).

Before applying collateral estoppel a court must determine that equity permits it.  See

Pace v. Kuchinsky, 347 N.J. Super. 202, 215, 789 A.2d 162 (App. Div. 2002).  New Jersey

courts have recognized five equitable exceptions to collateral estoppel identified in the

Restatement (Second) of Judgments.  Ensslin v. Township of North Bergen, 275 N.J. Super. 352,

FOR PUBLICATION

370, 646 A.2d 452  (App. Div. 1994) cert. denied 142 N.J. 446, 663 A.2d 1354 (1995) (citing

Zoneraich, 212 N.J. Super. at 94).

> (1)   "The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
>
> (2)   The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws;
>
> (3)   A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or
>
> (4)   The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or
>
> (5)   There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action."

Restatement (Second) of Judgments § 28 (1982).

With regard to the County and the Department, collateral estoppel effect should apply to

the ALJ determination that the punishment for the Smoking Incident was motivated by personal

animus.  Spicuzzo, however, should not be estopped because he was not a party to the original

proceeding.  The issue decided in the ALJ proceeding was whether the 30-day suspension was

the result of personal animus, the identical issue involved in assessing causation under CEPA.

Defendants' argument that not all of the CEPA factors were at issue is misplaced.  Not all the

CEPA elements need have been at issue in the ALJ proceeding in order for collateral estoppel to

FOR PUBLICATION

apply to the ALJ determination.  As discussed, application of collateral estoppel to the ALJ

determination with regard to the Smoking Incident does not mandate summary judgment on

Ivan's entire CEPA claim.  Collateral estoppel acts to bar a party from re-litigating an *issue* not

from litigating any claim of which that issue may form an element.

Second, this issue was actually litigated in an earlier proceeding.  The ALJ made clear to

the parties that the motive behind the suspension was clearly at issue, advising counsel:

> ...we were talking about retaliatory motive from his perspective, your justification for not
> being a retaliatory motive, and if I said anything with respect to retaliatory motive, that's
> in play.  All right.  It's in play, and your ability to defend against retaliatory motive is also
> in play.

(Certification of John P. Nulty, Jr. (Dkt. No. 136 (filed Jan. 31, 2008)) ("Nulty Supp. Cert."), Ex.

Q at 22.)  Each party was then on notice to litigate the issue of retaliatory motive and there is no

evidence that the County or Department failed to vigorously litigate such issue.  To the contrary,

it appears that both parties contested the ALJ proceeding.  (Pls.' Reply 10-11; Defs.' Opp. 9-12.)

Third, the MSB issued a final judgment on the merits.  Although defendants argue that

the MSB did not fully adopt the administrative law judge's findings of fact and, therefore, the

findings of fact were not part of the final determination of the MSB, the record simply does not

support this characterization.  The MSB "... accepted and adopted the Findings of Fact and

Conclusion as contained in the initial decision and the ALJ's recommendations to reverse the 30-

day suspension and uphold the removal."  (Nulty Supp. Cert, Ex. Q at 1.) To be clear, the Court

does not conclude that such personal animus itself arose because of Ivan's whistle blowing

activities, just that Spicuzzo filed the action because of personal animus for Ivan.  A reasonable

jury might infer that this animus arose because of Ivan's complaints but the ALJ's determination

did not encompass such an inference.

FOR PUBLICATION

Fourth, the determination of retaliatory motive was essential to the ALJ's determination. This the ALJ made clear to the parties at the outset. By showing that her punishment for the Smoking Incident was motivated by personal animus Ivan was able to demonstrate that the reasons proffered by the Department for her suspensions were pretextual.

Fifth, at least with regard to the County and Department, defendants were party to the prior proceeding and the Department had a clear continuity of interest with the County. See Bonenberger v. Plymouth Township, 132 F.3d 20, 25 n.4 (3d Cir. 1997) (treating a municipality and its police department as one entity).

Application of collateral estoppel is equitable because none of the exceptions to the general rule apply here. The first exception does not apply because there were two levels of review. The initial determination of the ALJ was appealable to the MSB and findings and conclusions of the MSB are reviewable by the Appellate Division of the Superior Court of New Jersey. See, e.g., Constantino v. New Jersey Merit System Board, 313 N.J. Super. 212, 712 A.2d 1158 (App. Div. 1998); In re Taylor, 158 N.J. 644, 655-56, 731 A.2d 35 (1999). Having concluded that the ALJ determination as to personal animus was a final determination, the Court need not entertain defendants' argument that this exception should apply because only final determinations are appealable.

The second exception does not apply because there has been no change in the underlying legal principles and, in any event, the issue was primarily one of fact and not of law.

The third exception is a closer call but the Court is confident that under New Jersey law the process afforded defendants in the ALJ proceeding is comparable in quality and extensiveness to the process that would be available in this Court. Defendants primary objection

FOR PUBLICATION

is that Ivan was allowed to read from the deposition of sheriff's officer Alteria, depriving the County's counsel of an opportunity to cross-examine.  (Defs.' Opp., Ex. B.)  New Jersey courts have recognized application of collateral estoppel to agency determinations in state retaliation cases.  See, e.g., Hennessey v. Winslow Township, 183 N.J. 593, 875 A.2d 240 (2003); Ensslin, 275 N.J. Super. 352.  Although plaintiffs argue that the rules applied by the administrative law judge are the same rules applied in Ensslin, there is no indication that hearsay evidence was admitted in that case.  In any event, the administrative judge did not rely on this evidence in reaching his determination, concluding that personal animus of Spicuzzo was a motivating factor because "[t]he explanations given by the Sheriff and Chief Almasy ... were ludicrous and nonsensical."  (Nulty Supp. Cert., Ex P at 45.)  The introduction of the deposition testimony of officer Alteria did not contribute to this finding.

The fourth exception does not apply because the County bore the same burden of persuasion in the ALJ proceeding as it would in a CEPA proceeding.  Once a plaintiff makes a prima facie showing, the burden shifts to the defendant to demonstrate that there was a legitimate reason for the adverse employment action.  See Blackburn v. United Parcel Service, 179 F.3d 81, 92 (3d Cir. 1999); Bowles v. City of Camden, 993 F.Supp. 255, 261-62 (D.N.J. 1998); Kolb, 320 N.J. Super. at 479.  In the ALJ proceeding the County bore the same burden.

Finally, the fifth exception does not apply because there is no potential impact on the public interest.  Only the interests of the parties to the present case are at stake.  It was clearly foreseeable that the determinations of the ALJ might arise in a later proceeding.  To reiterate, the County and Department had a full opportunity to litigate the issue.

FOR PUBLICATION

Ultimately, the Court is convinced that collateral estoppel should apply because this case

is so similar to <u>Ensslin</u>.  In <u>Ensslin</u>, the plaintiff, a police officer in the Township of North

Bergen who was rendered paraplegic by a skiing accident, challenged his termination in an

administrative proceeding before an administrative law judge.  The administrative law judge

determined that his termination was proper because the plaintiff was incapable of performing his

duties of a police officer.  <u>Ensslin</u>, 275 N.J. Super. at 358-61.  The MSB adopted the

administrative law judge's findings of fact.  The Law Division upheld the MSB determination on

summary judgment grounds.  The <u>Ensslin</u> court upheld but on the ground of issue preclusion.  <u>Id.</u>

at 369.

Defendants, relying on <u>Hennessey</u>, attempt to frame the issue as whether a defendant

should be precluded in a later federal suit solely because the plaintiff elected to pursue an

administrative proceeding.  The <u>Hennessey</u> court held that a plaintiff should not be precluded

from bringing an LAD claim in Superior Court after the plaintiff initially proceeded via an

administrative process but abandoned such process before appealing to the MSB.  <u>Hennessey</u>, 183

N.J. at 602.  <u>Hennessey</u> can be distinguished.  The reasoning underpinning the <u>Hennessey</u> court's

decision was that plaintiff had a right to elect which remedy she wished to pursue.  The

<u>Hennessey</u> court held that the plaintiff could abandon her administrative claim before review by

the MSB in favor of the Superior Court because there had not yet been a determination on the

merits.  <u>Id.</u> at 604.  No MSB determination had been made when the <u>Hennessey</u> plaintiff brought

suit in Superior Court.  <u>Id.</u>  Here, the MSB upheld the administrative judge's decision.

Moreover, to the extent that defendants read equitable considerations into the <u>Hennessey</u> court's

holding, that equity would not stretch so far as to encompass the Department.  Defendants have

FOR PUBLICATION

no right to elect remedies under the administrative appeal process and it is hardly unfair for the defendants to proceed under the administrative process.

The above analysis applies to Spicuzzo with one important exception. Spicuzzo did not have the benefit of representation by counsel. Because Spicuzzo was not a party to the proceeding, collateral estoppel applies only if Spicuzzo had privity or an identity of interest with the Department. Solely because parties have similar interests in the outcome of a litigation does not establish privity for purposes of collateral estoppel. See In re Dawson, 136 N.J. at 22. Application of collateral estoppel to Spicuzzo is inappropriate because his interests were not perfectly aligned with that of the County or Department. See id. (application of collateral estoppel is inappropriate if "it shall affirmatively appear in the action that there exists a conflict of interest between the persons so joined and the persons not joined."). Because personal animus might tend to suggest willful indifference to Ivan's complaints, the administrative judge's determination could support individual liability for Sheriff Spicuzzo. Accordingly, Spicuzzo is not estopped from contending that the punishment for the Smoking Incident was motivated by personal animus.

Because the Court concludes that collateral estoppel is appropriate, the County and Department are estopped in the present matter from contending that the Smoking Incident was not motivated by personal animus. This is not to say that plaintiffs are entitled to summary judgment on Ivan's CEPA claim. Although, plaintiffs have shown that Ivan's punishment in connection with the Smoking Incident was motived by personal animus, plaintiffs have failed to demonstrate that there is no genuine issue of material fact as to all the elements of CEPA. A plaintiff must prove four elements of her CEPA claim: (1) that the plaintiff reasonably believed

FOR PUBLICATION

that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. Kolb, 320 N.J. Super. at 476; Dzwonar, 177 N.J. at 462.

Plaintiffs' motion for summary judgment fails on causation. The filing of EEOC charges and the federal complaint both occurred after Sheriff Spicuzzo submitted his initial report. So only the written complaints could constitute protected activities. The written complaints occurred almost a year and a half before Spicuzzo submitted the report on the smoking incident. There is nothing more in the record tying Spicuzzo's personal animus to these written reports and, given the significant time lag between the protected activity and the purported reprisal, more is needed to foreclose any reasonable conclusion that the two were not connected.

This is not to say that defendants' motion for summary judgment must be granted. The factual record contains support for a reasonable inference that the punishment was caused by Ivan's whistle-blowing activity as well as a reasonable inference that it was not. Whether it was in fact is for the jury to decide. It follows that both plaintiffs' and defendants' motions for summary judgment with regard to Count Fifteen must be denied.

Defendants assertion that CEPA does not impose individual liability on employees and supervisors is not supported by the case law or the statutory text. CEPA imposes liability on a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J. Stat. Ann. 34:19-2(a). CEPA also imposes individual liability upon retaliatory parties who act with the authorization of their employers. See Palladino v. VNA of Southern New Jersey, Inc., 68 F.Supp.2d 455, 471-74 (D.N.J. 1999); see

FOR PUBLICATION

also Espinosa v. Continental Airlines, 80 F.Supp. 2d 297, 306 (D.N.J. 2000).  Defendants

argument is based entirely on the New Jersey Supreme Court's refusal to disturb dismissal by a

trial court of claims against individual employees under CEPA.  See Higgins v. Pascack Valley

Hosp., 158 N.J. 404, 730 A.2d 327 (1999).  This purported holding in Higgins was dealt with

squarely in Palladino.  Because the Higgins court decided individual liability could not be

imposed on the facts, the Palladino court concluded that Higgins actually supported the existence

of individual liability.  See Palladino, 68 F.Supp.2d at 473-74.  Because Spicuzzo could be held

individually liable under CEPA defendants' motion for summary judgment must fail.

ii.     Petition Clause

As with Jazikoff, there is no serious contention that Ivan's complaint were not

constitutionally protected activity.  Additionally, because the retaliation against Ivan included a

suspension, plaintiffs have clearly introduced evidence of a retaliatory act.  Plaintiffs run into

some difficulty on causation, however.  The alleged retaliation occurred several months after

Ivan filed her complaint.  But lack of temporal proximity is not dispositive.  Because defendants

are estopped from contesting the administrative judge's determination that personal animus was

at play in Ivan's punishment for the Smoking Incident a reasonable juror could conclude that such

punishment was retaliation for Ivan's complaints. Defendants motion for summary judgment as to

Count Eleven is denied.

In summary, the Court grants defendants' motion for summary judgment on plaintiffs'

LAD retaliation claims.  The Court denies defendants' motion for summary judgment on plaintiff

Ivan's CEPA claim and on the petition clause claims.  Finally, the Court denies in part and grants

in part plaintiffs' motion for summary judgment on Ivan's CEPA claim.

FOR PUBLICATION

**Counts Nine & Ten: Equal Protection**

The Court addresses next plaintiffs' section 1983 claims against the County, Department, and individual defendants.  Plaintiffs claim that the County and Department violated their equal protection rights in the following ways: (1) by requiring that officers of the same sex transport and search prisoners of the same sex, (2) by failing to train, discipline or control the individual defendants who sexually discriminated and harassed plaintiffs.  Plaintiffs assert that individual defendants are each individually liable under section 1983.

The County, Department and each individual defendant has moved for summary judgment with respect to each plaintiff's § 1983 cause of action.

1.      *Individual Liability under Section 1983*

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws."  Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983.  Only purposeful discrimination is actionable under section 1983.  See Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992);

To impose individual liability under § 1983 for equal protection violations, the defendants must have been personally, affirmatively involved in the alleged wrongdoing.  See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006).  Each Plaintiff must prove that the individual defendants personally participated in violating her rights, or that they directed others to violate them, or that they had knowledge of and acquiesced in their subordinates'

FOR PUBLICATION

violations.  See Robinson, 120 F.3d at 1293 (quoting Baker v. Monroe Twp., 50 F.3d 1186,

1190-91 (3d Cir.1995)).  A harasser who has no formal or de facto supervisory authority over

plaintiff cannot be held liable under section 1983 because the requisite element of state action is

lacking.  See Zelinski v. Pa. State Police, 108 Fed. Appx. 700, 703 (2004).  But the harasser's

supervisor may be held liable if the supervisor had knowledge of the harassment and acquiesced

in his or her subordinates' wrongful acts.  See Andrews v. City of Philadephia, 895 F.2d

1469,1478-79 (3d Cir. 1990).

Here, plaintiff Ivan has produced evidence that she was harassed by Allen on the basis of

her gender. Likewise, plaintiff Jazikoff has presented evidence that Blount harassed her because

of her gender.  Both plaintiffs have also presented evidence that incidents of harassment occurred

when Allen and Blount had de facto or formal supervisory authority over Ivan and Jazikoff

respectively.  Therefore, plaintiffs have raised a genuine issue of material fact as to whether their

constitutional rights have been violated by the actions of Allen and Blount respectively.

In contrast, plaintiff Jazikoff has not presented any evidence that Landis and Pepenella

had any supervisory authority, formal or otherwise, over her.  Because they lacked supervisory

authority, their actions cannot be said to be under "color of state law."  See Zelinsky, 108 Fed.

Appx. at 703.  Although harassing conduct of Landis and Pepenella may be relevant to Jazikoff's

claim against Blount for his acquiescence in his subordinates' wrongdoing, Landis and Pepenella

cannot be individually liable under section 1983.  Accordingly, the Court grants summary

judgment on Jazikoff's section 1983 claims against Landis and Pepenella.

The evidence in the record raises a genuine issue of material fact with respect to whether

Spicuzzo and Falcone were aware of Allen's conduct toward Ivan and failed to prevent such

FOR PUBLICATION

action.  As detailed earlier, despite a recommendation for punishment, Allen was not disciplined but was instead told by Undersheriff Falcone that Sheriff Spicuzzo had decided not to take any action against him.  (Nulty Cert., Ex. JJ at 349:25-350:9.)  Based on this evidence, a reasonable jury could infer that Sheriff Spicuzzo and Undersheriff Falcone knew and acquiesced in Allen's wrongful conduct toward Ivan.

Plaintiffs also produced evidence that after Jazikoff met with the County's personnel department to report the various incidents of sexual harassment, Undersheriff Falcone berated Jazikoff and was hostile toward her.  (Nulty Cert., Ex. K at 5-6.)  This evidence is sufficient to raise a genuine issue of material fact as to whether Falcone was personally involved in violating Jazikoff's right to equal protection.

In contrast, Jazikoff does not allege, much less produce evidence, that Spicuzzo was in any way involved in the sexual harassment she claims to have experienced.  Nor has Jazikoff referred to any evidence which establishes, with "appropriate specificity," that Spicuzzo personally directed or had actual knowledge of the sexual harassment allegedly directed at plaintiff by Blount, Landis and Pepenella.   Accordingly, the Court will enter summary judgment with respect to Jazikoff's section 1983 claim against Spicuzzo.

a.      *Qualified Immunity*

Defendants contend that even if there are disputes of fact as to whether plaintiffs' rights to equal protection have been violated, they cannot be held liable because they are entitled to qualified immunity.  Defendants' argument is without merit.  A public official's actions are protected by qualified immunity if he or she can show that the "offending" conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would

FOR PUBLICATION

have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Contrary

to defendants' assumption that plaintiffs are asserting a due process right, the right at issue in this

case is a right to be free of discrimination based on sex in the workplace, a right grounded in the

equal protection clause of the Fourteenth Amendment.  The Third Circuit has held that the right

to be free from sexual harassment and discrimination "was well grounded in law and widely

known to the public by 1986."  Andrews 895 F.2d at 1479 (denying qualified immunity to city

officials for sexual harassment on this ground).  Accordingly, the Court holds that Spicuzzo,

Falcone, Allen, and Blount are not protected by qualified immunity in treating, or allowing their

subordinates to treat, female employees differently on the basis of their gender.  :

In summary, with respect to Jazikoff's section 1983 claims, the Court grants Spicuzzo's,

Landis's and Pepenella's motions for summary judgment and denies Blount's and Falcone's

motions.  As to Ivan's section 1983 claims, the Court denies Spicuzzo's, Falcone's and Allen's

motions for summary judgment.

2.      *County and Department*

To subject a governmental entity to liability, the constitutional deprivation must result

from an official custom or policy.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 691-94,

98 S. Ct. 2018 (1978).  An official custom is "such practices of state officials ... so permanent

and well settled as to constitute a 'custom or usage' with the force of law."  Simmons v. City of

Philadelphia, 947 F.2d 1042, 1059 (3d Cir.1991) (quoting Monell, 436 U.S. at 691).  A

municipal policy is a "statement, ordinance, regulation, or decision officially adopted and

promulgated by [a local governing] body's officers."  Id. (citations omitted).

FOR PUBLICATION

No municipal liability will arise solely because it employs a tortfeasor; in other words, a

municipality will not be held liable under section 1983 on a theory of *respondeat superior*.  See

Monell, 436 U.S. at 691.  A municipality's failure to train state actors will only give rise to a

constitutional tort when that failure amounts to deliberate indifference to the rights of persons

with whom they come into contact.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109

S.Ct. 1197 (1989).  Deliberate indifference exists if the challenged act implements a municipal

policy or custom.  See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997).

Accordingly, deficient training, discipline or control of municipal officials may form a basis for

municipal liability under section 1983 only if plaintiff can show "both (1) contemporaneous

knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2)

circumstances under which the supervisor's inaction could be found to have communicated a

message of approval to the offending subordinate." Id. (quoting Freedman v. City of Allentown,

853 F.2d 1111, 1117 (3d Cir. 1988)).

Plaintiffs claim that the Department's written and unwritten policies intentionally and

facially discriminate based on gender.  In support, plaintiffs point to the following evidence.

General Orders 60:4.4 and 6:11.2 require that a prisoner be searched and transported by officers

of the same sex of the prisoner whenever possible.  (Murphy Report at 6.)  By departmental

custom, female officers cannot be partnered together and a female officer must be on duty for

every shift.  (Murphy Report at 10-11.)  In addition, the Department maintains a separate

overtime list for male and female officers and places limitations on switching shifts by female

officers.  (Id.)  Plaintiffs contend that these policies negatively affected the conditions of

employment for the female officer because they were more restricted from changing shifts and

FOR PUBLICATION

were compelled to work a disproportionate amount of mandatory overtime shifts as compared to male officers.  In addition, Sheriff Spicuzzo stated that gender played a role in determining how posts in the Department were filled and that female officers more qualified than male officers had been denied opportunities.  (Nulty Cert., Ex. X Spicuzzo Dep. 63:24-64:18.)  Plaintiff Jazikoff was advised that she would not need the training given to all other new officers in all divisions of the Department because she would be limited to working in the Transportation Division.  (Nulty Cert., Ex. K Jazikoff Aff. ¶ 4.)

Defendants do not appear to dispute that the Department's policies and practices are facially discriminatory.  They instead assert that its discriminatory staffing policy is justified as a bona fide occupation qualification ("BFOQ").

Title VII does not prohibit sex-based discrimination when sex is a bona fide occupational qualification reasonably necessary to the normal operation of a particular business or enterprise. See 42 U.S.C. 2000e-2(e)(1).  The so-called "BFOQ" defense is to be read narrowly.  See Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 204, 111 S.Ct. 1196, 1206 (1991);  Dothard v. Rawlinson, 433 U.S. 321, 333, 97 S. Ct. 2720 (1977); Healey v. Southwood Psychiatric Hosp., 78 F.3d 128, 132 (3d Cir. 1996).  The Supreme Court has held that sex-based discrimination is permissible only with regard to aspects of a job that "fall within the 'essence' of the particular business."  Johnson Controls, 499 U.S. at 206.  The employer bears the burden of establishing the BFOQ defense.  See id. at 221-22.  A defendant employer can satisfy its burden of proof only by proving that they had a factual basis for believing that no members of one sex could perform the job in question.  See Healey, 78 F.2d at 132.

FOR PUBLICATION

As an initial matter, neither party has briefed the Court on the question of whether the BFOQ defense, a statutory defense against Title VII claims, can defeat a section 1983 claim. Even if the Court assumes for purposes of this motion that the BFOQ defense does apply, defendants have not sustained their burden.

Defendants point to the need of the department to transport female prisoners from and to the courthouse and to search them as needed. Defendants argue that the gender-specific assignment is necessary to protect the prisoners' privacy.[12] The Defendants also refer to several provisions in the New Jersey Administrative Code and a New Jersey statute governing segregation of prisons and search of prisoners.[13] As example, the New Jersey Administrative Code requires that strip searches be conducted by a guard of the same sex as the prisoner. See, e.g., N.J. Admin. Code 10A:3-5.7. In contrast, an adjacent provision in the Code explicitly provides that "pat searches may be conducted by either male or female custody staff members regardless of the gender of the inmate." N.J. Admin Code 10A:3-5.6(d). Defendants have not offered any evidence that indicates how often strip searches are conducted during processing and transport of prisoners. If strip searches are conducted frequently, it may be that the presence of a female officer would be necessary at all times. If, however, strip searches are isolated occurrences, the department could achieve its purpose of protecting the privacy of the prisoner by

---

[12] Sheriff Spicuzzo and Undersheriff Falcone have testified that the sole reason for having female officers search and transport female prisoners is to protect male officers from lawsuits. Nulty Cert., Ex. W, Falcone Dep. 92:5-93:1; Ex. X Spicuzzo Dep. 208:6-210:8.)

[13] New Jersey law requires that the Sheriff "appoint one or more female guard or guards [sic] over such female prisoners at all hours during the night." N.J. Stat. Ann. 30:8-12. As plaintiffs point out, this statute is inapplicable because the female sheriff's officers here were not female guards in a prison under Sheriff Spicuzzo's jurisdiction.

FOR PUBLICATION

calling a female officer when the need arises.  In short, Defendants have not shown that they

could not reasonably arrange job responsibilities in a way to minimize a clash between the

privacy interests of the prisoners, and the non-discriminatory principle of the Equal Protection

Clause.  See Healey, 78 F.3d at 132.

As further support of the validity of the BFOQ defense, defendants point to the New

Jersey Division of Equal Employment Opportunity and Affirmative Action ("EEO/AA")'s

approval of the Department's application to make certain Sheriff's Officer positions female only

("BFOQ application").[14]  Defendants urge that the Court defer to this determination by the state

agency, citing cases in which the courts accorded deference to agency determinations when

reviewing their decisions.  However, the decision of EEO/AA is not being reviewed by this Court

for affirmance or reversal.  It is simply an item of evidence that the Court may consider in review

of all the other pertinent facts of this case for purposes of this motion.  As said earlier, defendants

have not presented enough evidence to sustain their burden of establishing the BFOQ defense.

Moreover, plaintiffs have submitted evidence which undermines the reliability of the BFOQ

application.  The Court therefore denies the County and the Department's motion for summary

judgment on plaintiffs' section 1983 claims.

**Counts Thirteen & Fourteen: Conspiracy**

In counts Thirteen and Fourteen plaintiffs seek damages under 42 U.S.C. § 1983 and §

1985(3) for an alleged constitutional conspiracy by the defendants. Although both the plaintiffs

---

[14]  The BFOQ application was submitted on June 3, 2003, about 50 days after this suit
was filed.

FOR PUBLICATION

and Defendants have only briefed the merits of the § 1985(3) conspiracy claim the Court also

considers the merits of the § 1983.

1.     *Standard*

        To demonstrate an unconstitutional conspiracy a plaintiff must show that two or more

conspirators reached an agreement to deprive the plaintiff of a constitutional right under color of

state law.  See Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d. Cir. 1993),

abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington,

316 F.3d 392 (3d Cir. 2003). In order to establish a § 1983 conspiracy claim a plaintiff must

show "(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by

the defendants with the specific intent to violate the aforementioned right." Williams v. Fedor, 69

F.Supp.2d 649, 665 (M.D. Pa. 1999), aff'd 211 F.3d 1263 (3d Cir. 2000) *(*quoting Kerr v. Lyford,

171 F.3d 330, 340 (5th Cir. 1999)). To sufficiently plead a § 1985(3) claim a plaintiff must

establish "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person

is injured in his person or property or deprived of any right or privilege of a citizen of the United

States." Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Bhd. of

Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352 (1983).

        A claim for conspiratorial liability "must … contain supportive factual allegations." Rose

v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989). The factual allegations supporting the conspiracy

claim may not be generalized or conclusory.  See id.; D.R. v. Middle Bucks Area Vocational

Technical Sch., 972 F.2d 1364, 1377 (3d Cir. 1992), cert. denied, 506 U.S. 1079, 113 S.Ct. 1045

FOR PUBLICATION

(1993); Durre v. Dempsey, 869 F.2d 543, 545 (10th Cir. 1989). The Third Circuit has provided

further guidance in the RICO context by noting that "[t]o plead conspiracy adequately, a plaintiff

must set forth allegations that address the period of the conspiracy, the object of the conspiracy,

and the certain actions of the alleged conspirators taken to achieve that purpose." Shearin v. E.F.

Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989) abrogated on other grounds by Beck v.

Prupis, 529 U.S. 494, 505-06, 120 S. Ct. 1608 (2000); see also Smith v. Bacon, 699 F.2d 434,

436-37 (8th Cir. 1983) (plaintiff must allege facts showing a "meeting of the minds"); Polur v.

Raffe, 912 F.2d 52, 56 (2d Cir. 1990) ("It is incumbent on a plaintiff to state more than

conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of

his constitutional rights"); Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir. 1990) cert. denied, 499

U.S. 976, 111 S. Ct. 1622 (1991) ("The participants in the conspiracy must share the general

conspiratorial objective.... To demonstrate the existence of a conspiratorial agreement it simply

must be shown that there was 'a single plan, the essential nature and general scope of which

[was] know[n] to each person who is to be held responsible for its consequences.'") (quoting

Hoffman-La Roche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971)). The Third Circuit

clearly stated that this heightened pleading requirement applies to both § 1983 and § 1985(3)

conspiracy claims. See Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008) (stating

that in order to support a § 1983 or a § 1985(3) claim plaintiff must show a "meeting of the

minds") (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 158, 90 S. Ct. 1598 (1970)).

2.      *Analysis*

        Plaintiffs have failed to support their constitutional conspiracy claims with sufficient

factual allegations. Plaintiffs' complaint contains bare allegations of a conspiracy to discriminate

**FOR PUBLICATION**

without specific factual allegations identifying the conspirators or the particular actions taken by the conspirators to accomplish their discriminatory goal. At most, plaintiffs make broad allegations that the entire "Sheriff's Department proffered false testimony from a Superior Officer" without identifying the specific departmental officers involved or the conspiracy associated with the alleged false testimony. (See Second Am. Compl. ¶ 122.)

Plaintiffs' subsequent pleadings and opposition briefing do not remedy this fatal lack of specificity. Plaintiffs merely repeat and defend their broad allegations of a department-wide conspiracy without referring to additional facts which could reasonably support an inference that such a conspiracy existed. Plaintiffs further complicate the issue by asserting an additional conspiracy in their opposition brief regarding the "BFOQ application" which plaintiffs claim was generated by the Sheriff's department to "manufacture a defense" based upon "plagiarized" and unsupported information. (See Defs.' Opp. 80). Plaintiffs single out Sergeant Sathan and Director Cross as participating in this alleged conspiracy but fail to allege any specific facts from which this Court can infer that a "meeting of the minds" occurred and that Sathan, Cross or any other department officials were acting to further an agreed upon conspiracy. Moreover, the unlawful conduct surrounding the BFOQ application is alleged to have occurred after the period of discrimination which forms the basis of plaintiffs' claims.  It is unclear how this conspiracy, even if it were supported by the facts, would support plaintiffs' section 1983 and section 1985(3) claims.  Accordingly, the Court grants summary judgment to all defendants on Counts Thirteen and Fourteen.

**CONCLUSION**

**FOR PUBLICATION**

For the preceding reasons, defendant's motion for summary judgment is granted in part

and denied in part.  Plaintiffs' motion for summary judgment is denied.


s/William H. Walls
United States Senior District Judge


**Appearances**

Peter Ciolino, Esq.
Harwood Loyd
130 Main Street
Hackensack, NJ 07601
          Attorney for Mediator

Jeffrey G. Garrigan, Esq.
Cammarata, Nulty & Garrigan, L.L.C.
850 Bergen Avenue
Jersey City, NJ 07306
      -and-
John P. Nulty, Jr., Esq.
Cammarata, Nulty & Garrigan, Esqs.
850 Bergen Avenue
Jersey City, NJ 07306
          Attorneys for Plaintiffs Joan Ivan and Angel Jazikoff

Joseph V. Biancamano, Esq.
Biancamano & Di Stefano
Executive Plaza
10 Parsonage Road
Suite 212
Edison, NJ 08837
      -and-
Patrick J. Bradshaw, Esq.
Kelso & Bradshaw, Esqs.
132 Hamilton Street
Po Box 1208
New Brunswick, NJ 08903
          -and-

**FOR PUBLICATION**

Lawrence F. Citro, Esq.
Biancamano & Di Stefano, Pc
10 Parsonage Road
Suite 212
Edison, NJ 08837
     Attorneys for Defendants Count of Middlesex, Middlesex County Sheriff's Department

Craig L. Corson, Esq.
Hoagland, Longo, Moran, Dunst & Doukas, Llp
40 Paterson Street
Po Box 480
New Brunswick, NJ 08903
     Attorney for Defendant Undersheriff Angelo Falcone

Lori A. Dvorak, Esq.
Dvorak & Associates, Llc
390 George Street
8th Floor
New Brunswick, NJ 08901
     -and-
Marc D. Mory, Esq.
Dvorak & Associates, Llc
390 George Street
8th Floor
New Brunswick, NJ 08901
     Attorney for Defendant Lieutenant Donald Blount
     -and-
Michael John Stone, Esq.
The Stone Law Group
20 Glenview Drive
Warren, NJ 07059
     Attorney for Defendant Sergeant Bruce Allen

Clark W. Convery, Esq.
Convery, Convery & Shihar
32 South Main
Edison, NJ 08837
     Attorney for Defendant Officer Robert Landis

George A. Spadoro, Esq.
Wolff & Samson PC
Offices at Crystal Lake
One Boland Drive

**FOR PUBLICATION**

West Orange, NJ 07052
        -and-
Keyana Capri Laws, Esq.
Wolff & Samson PC
One Boland Drive
West Orange, NJ 07052
        Attorneys for Defendant Officer Alexander Pepenella